**Thomas H. WASHINGTON, Jr.,**
**Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 20232.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 25, 1967.

Decided Dec. 13, 1967.

See also, D.C.Cir., 379 F.2d 166.

crime. See Naples v. United States, 120 U.S.App.D.C. 123, 127, 344 F.2d 508, 514 (1964). See also JUNIOR BAR SECTION, D.C. BAR ASSOCIATION, CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA 55 (1966).

Mr. Frank U. Fletcher, Washington, D. C. (appointed by this court) for appellant.

Mr. Edward T. Miller, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Joel D. Blackwell, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, FAHY* and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

Appellant was convicted by a jury of rape, robbery, and assault with a deadly weapon. His major defense was insanity. On appeal, he contends that the trial judge should have entered a judgment of acquittal by reason of insanity.

## I

 This court has always been reluctant to order such judgments of acquittal.[1] Our reluctance is rooted in the nature of the jury's role in insanity cases. In the early eighteenth century, the test for criminal responsibility was whether the accused "does not know what he is doing, no more than * * * a wild beast."[2] Under this test, the jury did not need to hear and evaluate a complex body of evidence. Presumably the jury and the witnesses knew a wild beast when they saw one. Later, English courts began to focus on whether the accused could distinguish between right and wrong. They also began to hear medical testimony.[3] The landmark *M'Naghten* case[4] made both these trends a standard part of English and American law. Under *M'Naghten*, the test for insanity was whether the accused was "laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of what he was doing, or if he did know it, that he did not know he was doing what was wrong."[5] The use of the term "disease of the mind" was significant since it firmly established the relevance

---

* Circuit Judge Fahy became Senior Circuit Judge on April 13, 1967.

1. *See, e. g.,* King v. United States, 125 U.S.App.D.C. 318, 372 F.2d 383 (1967); Hawkins v. United States, 114 U.S.App. D.C. 44, 310 F.2d 849 (1962).

2. GLUECK, MENTAL DISORDER AND THE CRIMINAL LAW 138–139 (1925), citing Rex v. Arnold, 16 How.St.Tr. 695, 764 (1724).

3. GLUECK, *op. cit., supra* note 2, at 142–143.

4. 8 Eng.Rep. 718 (1843).

5. *Id.* at 722.

of medical testimony. The jury now had a broader role—to evaluate medical testimony in light of the right-wrong criterion. Soon, however, doctors began to complain that the right-wrong test permitted too narrow an inquiry into the accused's mental condition, that it precluded doctors from presenting important medical data.[6] In Durham v. United States,[7] we announced a new test for insanity: "An accused is not criminally responsible if his unlawful act was the product of a mental disease or defect."[8] We intended to widen the range of expert testimony in order to enable the jury "to consider all information advanced by relevant scientific disciplines."[9]

This purpose was not fully achieved, largely because many people thought *Durham* was only an attempt to identify a clearly defined category of persons—those classified as mentally ill by the medical profession—and excuse them from criminal responsibility. In fact, the medical profession has no such clearly defined category, and the classifications it has developed for purposes of treatment, commitment, etc., may be inappropriate for assessing responsibility in criminal cases. Since these classifications were familiar, however, many psychiatrists understandably used them in court despite their unsuitability. And some psychiatrists, perhaps unwittingly, permitted their own notions about blame to determine whether the term mental illness should be limited to psychoses, should include serious behavior disorders, or should include virtually all mental abnormalities. To ensure that the views of the experts would not bind the fact-finder, we decided to give mental illness a legal definition independent of its medical meaning. We announced in McDonald v. United States that mental illness "includes any abnormal condition of the mind which substantially affects mental or emotional processes and which substantially impairs behavior control."[10] We recognized that there may be many reasons why a person's ability to control is impaired. His mental or emotional processes may have been adversely affected by his genetic structure, his physical condition, his family, educational or cultural backgrounds.[11] Thus we called upon the jury to "consider testimony concerning the development, adaptation and functioning of these processes and controls."[12]

In insanity cases today, the jury must be prepared to hear evidence concerning diverse aspects of defendant's life and then to make difficult judgments regarding the impairment of behavioral processes and controls. By their very nature these judgments cannot be precise. Thus, within the confines of the *Durham-McDonald* standard, the jury must be allowed a wide latitude in its task. A judgment of acquittal by reason of insanity is appropriate only when a jury verdict of guilty would clearly violate the law or the facts.

We cannot say that this was the situation in Washington's case. The district court did not err in its refusal to enter a judgment of acquittal by reason of insanity.

## II

We all agree that this court's limited role in supervising the verdict does not

---

6. Stephen mentions these early complaints in his 2 HISTORY OF THE CRIMINAL LAW of ENGLAND 124–126 (1866). For a compilation of more recent complaints against the right-wrong test, see Durham v. United States, 94 U.S.App.D.C. 228, 236–240, 214 F.2d 862, 870–874, 45 A.L.R.2d 1430 (1954).

7. *Supra* note 6.

8. *Id.* at 241, 214 F.2d at 874–875.

9. *Id.* at 239, 214 F.2d at 872.

10. 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962) (en banc).

11. Psychiatric studies indicate that there is a higher incidence of certain types of mental illness among certain social classes. See, e.g., HOLLINGSHEAD & REDLICH, SOCIAL CLASS AND MENTAL ILLNESS, part 3 and *passim* (1958).

12. McDonald v. United States, *supra* note 10, at 124, 312 F.2d at 851.

imply an equally limited role in supervising the evidence which is put before the jury. To the contrary, the jury's wide latitude in deciding the issue of responsibility *requires* that trial judges and appellate judges ensure that the jury base its decision on the behavioral data which are relevant to a determination of blameworthiness.[13] We disagree, however, on the quality of the data in this case. Judge Robinson and I are deeply troubled by the persistent use of labels and by the paucity of meaningful information presented to the jury. Experience with the administration of the insanity defense has revealed that, despite the earnest efforts of witnesses, counsel and judges, these defects are a recurring problem. We will therefore describe them in detail in this section. Judge Fahy will state his views on this matter in a separate concurring opinion.

The testimony of the defense psychiatrist, Dr. Adland, was based solely on a one hour and fifteen minute interview with defendant. Dr. Adland did not administer electroencephalogram, neurological, or physical tests, and did not have the benefit of reports of the tests given at Saint Elizabeths Hospital. He requested permission to see them, but permission was denied.

Since the defendant was at Saint Elizabeths Hospital for two months, the two Government psychiatrists had an opportunity for more prolonged observation. Yet both Dr. Owens and Dr. Hamman testified that they had seen Washington for approximately the same amount of time as Dr. Adland. Of course, they did have the benefit of the testing and observations performed by others at the Hospital. As Dr. Owens explained:

> When a patient is under constant observation, the examinations that were conducted in St. Elizabeth's by the psychiatrists, laboratory studies, psychological examinations, social service,

interviews with relatives, all of this was part of the basis of my opinion that I rendered and the examination which I conducted at the medical staff conference on November 16, 1965. * * * By [constant observation] I mean 24 hours a day, and reports are submitted to the physicians as to their behavior, actions or activity while on the ward.

Unfortunately, except for brief references to a Rorschach test, none of this information was presented to the jury. The Government psychiatrists claimed to have based their conclusions on these studies, but they told the jury only the conclusions without any explanation of the studies themselves, what facts the studies uncovered, and why these facts led to the conclusions.

There was other available information, as well, which the jury was not told about. When Washington was twelve or thirteen, he was committed to Cedar Knolls, the District of Columbia School for Children. Apparently the records of that institution contained a lengthy history of Washington's childhood. At first, defense counsel moved them into evidence, but later he withdrew that request, perhaps because he thought it would be tactically unwise to make the jury read such a long report. Whatever the reason, the jury was forced to make its decision without any historical background on the defendant.

The omission of significant underlying information was one defect in the testimony. Another was that the jury was often subjected to a confusing mass of abstract philosophical discussion and fruitless disputation between lawyer and witness about legal and psychiatric labels and jargon. Dr. Hamman's entire testimony on direct examination was that Washington did not have a "passive-aggressive personality," did not suffer from any "personality trait disturbance," did not have "an irresistible impulse,"

---

13. Our role here is analogous to our role in the administrative process. The administrative agency is given wide latitude in making judgments. Our responsibility is to ensure that the agency considers all the relevant facts and policies. We have a similar responsibility vis-a-vis the jury.

was "not mentally ill," and was not "abnormal from the standpoint of psychiatric illness." A substantial part of Dr. Owens' testimony was similar. He was familiar with the defendant, had participated in a staff conference at which the defendant was discussed, and had formed an opinion about him.

Q. All right. And what was that opinion?

A. It was my opinion that he did not have a mental disease or mental defect. * * *

He testified also that the defendant did not have "an irresistible impulse" to rape, did not have a "passive-aggressive personality," and that in any event someone with a "passive-aggressive personality" was not necessarily "mentally ill."

Even if these labels had meaning for the witnesses,[14] the testimony was useless unless that meaning was communicated to the jury. Explanation was attempted but it was often more confusing than clarifying. Dr. Owens explained that a "passive-aggressive personality"

is a type of personality that an individual has, that is, everybody has some-type of personality. We all have a type of personality. I mean no one has no personality. We have some type. Well, you may say schizoid personality, or compulsive personality, but speaking of the one that you ask, such [as] the passive aggressive personality, these are broken down into two different categories.

One is passive and one is aggressive. Usually in these people the aggressive type acts out in an aggressive manner, to either major or minor stressful situations, they maneuver under close confinement or under strict rules and regulations except maneuvering into a psychosis.

It is generally considered that the passive type or the aggressive type frequently or sometimes an aggressive

personality will also behave in a passive manner.

This is where we get the term "passive-aggressive." This is more a classification of the type of personality that the individual has.

\* \* \* \* \* \*

We all have a type of personality. For example, physicians are generally considered to be compulsive personalities. That is, they are very meticulous to details and work things out or in a very orderly and organized fashion.

Generally speaking lawyers are considered to be aggressive or to have an aggressive personality. If they are not, they cannot be real passive [sic] and really do an expert job.

They have to be aggressive. Everybody has a type of personality. I mean, you have to be categorized somewhere.

Other explanations cast serious doubt upon the basis for many of the experts' conclusions as expressed in their labels. For example, Dr. Owens did not think the defendant had an "impulse to rape." Here is his explanation: "I think it was not an impulse to rape. It was an impulse to have sexual relations with a lady and if she did not agree with it, why, they forced her." Dr. Hamman agreed that Washington did not have an irresistible impulse to rape. But here is what "irresistable impulse" meant to Dr. Hamman:

Q. Isn't this almost irresistible, this antisocial act when he is in this situation with the urge?

A. Not from the way I understand irresistible impulse. An irresistible impulse means to me that there is a conflict and the unwanted behavior breaks through. I do not think there is a conflict in Mr. Washington.

Q. But, without the theory of conflict, without the conflict, isn't it a fact that he is in the situation with the urge for sexual contact, he cannot stop?

14. *See* K. MENNINGER, THE VITAL BALANCE 5 and *passim* (1963).

A. Well, he will just do it. He has no desire to stop.

Q. He has no power to stop?

A. That is correct.

Q. And, doctor, isn't it a fact that he has no power to stop an irresistible impulse?

A. Not as I understand it.

Q. And you understand it from a legal terminology?

A. I understand it both from legal terminology and from a psychiatric terminology.

Dr. Owens testified also that Washington's difficulty in controlling his sexual impulses did not affect his "voluntary controls."

Q. Didn't this impulse to have sexual relations affect his voluntary behavior controls?

A. No, I would not think so. I think, had a policeman, or witnesses or say, if he and two or three men had been going to rape a lady and there had been thirty other men present, where their force would not overpower the woman, that they would have backed off for another lady somewhere else to have raped.

I think when I say it impairs his voluntary control, I would say that it did not.

Dr. Hamman thought that Washington was "psychiatrically normal." Then he added, "The best definition of normal I have ever heard is the person is not too neurotic."

These labels and definitions were not merely uninformative. Their persistent use served to distract the jury's attention from the few underlying facts which were mentioned. For example, the fact that Washington's difficulties "in relating adequately to other people are more severe or more extreme than the average [person's]" was immersed in a dispute about whether to classify these difficulties as a "personality defect," a "personality problem," a "personality disorder," a "disease," an "illness," or simply a "type of personality."

The psychological examinations suggested a person of "general intellectual ability, with little feelings for others," a person "who acts out in an antisocial way, has little control over his desires and his needs * * * has little guilt * * * does not feel things are wrong. * * * " But these facts were obscured by a dispute about whether a person with "sociopathic symptomology" is or is not "mentally ill."

Again and again the jury was diverted from evidence of the defendant's underlying mental and emotional difficulties by the emphasis on conclusory phrases. After defense counsel vigorously cross-examined Dr. Owens and brought out some facts which indicated that Washington's mental and emotional processes of control may have been impaired, the prosecuting attorney rehabilitated his witness as follows:

Q. Notwithstanding that history, doctor, and after that thorough study of Mr. Washington, you are of the opinion that he was not suffering with a mental illness on August 9, is that correct?

A. That is correct.

In this regard Dr. Hamman's testimony epitomized the whole trial. At times his testimony was more favorable to the defendant than the defense psychiatrist's testimony. According to Dr. Hamman, Washington had a twelve or thirteen year history of aggressive behavior. He has "very little regard for * * * people. And when he wants something, he takes it." "He has a tendency to be withdrawn, does not relate to people, tends to stay by himself." "He act out his impulses." "Mr. Washington [does not have] much control." "He is a very aggressive individual." Dr. Hamman agreed that Washington "does not have any brakes, things that stop him from doing antisocial acts" and that "he has no power to stop." But these underlying facts were muddied by disputes and conclusions about medical and legal terminology—about whether a person is "normal" if he is not "too neurotic," about whether Washington was suffer-

ing from a "neurosis," about whether he has a "schizoid personality" as opposed to "traits of a schizoid nature," about whether "he has sociopathic symptomology," or whether instead "he has aggressive antisocial activity," about whether he was a "sociopath," had "personality difficulty," "personality disorder," or merely "personality problems," about whether he suffered from "irresistible impulses," about whether his aggression indicated that he had a "character disorder," and about whether his aggressive acts were caused by a "personality pattern the way he reacts, rather than [a personality] disorder."

Whatever opportunity the jury may have had to focus upon the underlying information provided by Dr. Hamman, this opportunity was materially diminished by a series of redirects and recrosses which dealt entirely with labels. The prosecutor asked on redirect examination:

> Q. Now, the mere fact that this defendant has somewhat of a weird background according to what has come out here, and a very interesting sexual background, do you feel—I mean, as a result of all of this information you have assembled concerning him, is it still your opinion that this defendant was not suffering with a mental illness on August 9, 1965?
>
> A. That is correct. I do not think he was.

The defense attorney responded on recross:

> Q. Doctor, he still has this behavior problem and the control problem with these sexual urges, right?
>
> A. I am hesitating because I want to condense this as much as possible. He has problems in society. He does not have a problem with himself, and I think mental illness—it is my opinion that mental illness is one of the problems between he [sic] and himself. He may act it out and he may not. But I do not think he has

much problem with himself about this. He takes what he wants.

> Q. He is an emotional cripple, is he not?
>
> A. Yes.

\* \* \* \* \* \*

> Q. Doctor, wouldn't you say, based upon the history that Mr. Washington is chronically ill?
>
> A. No. I do not think he is ill.
>
> Q. You do not think he is ill at all?
>
> A. No.
>
> Q. He just cannot control what he is doing?
>
> A. Well, now, again when you say "can't," you imply that he would like to, and has a conflict. I don't think he wants to.

And finally, on redirect:

> Q. \* \* \* The mere fact that he is emotionally crippled, does that mean he is mentally ill?
>
> A. No.

\* \* \* \* \* \*

> Q. Now, I will ask you this. You have been asked, or in reply to a question you indicated that this defendant will take what he wants.
>
> A. Yes.
>
> Q. Well, now, the mere fact that he will take what he wants even if it is in the field of sex, does that mean he is mentally ill?
>
> A. No.[15]

It seems clear to Judge Robinson and me that the persistent use of conclusory labels may have hindered the jury in getting to the underlying facts. But we think that the jury obtained enough concrete information to preclude us from disturbing the verdict. The defense psychiatrist and, on cross-examination, the Government psychiatrists gave some meaningful descriptions of defendant's mental and emotional processes as emphasized in Judge Fahy's concurring opinion herein. Moreover, we recognize that, taken as a whole, the testimony in

---

15. Both lawyers aggravated the confusion by emphasizing the conflict of labels in their arguments to the jury. This seems to be the usual practice.

this case was, if anything, a little better than that in most insanity cases. Under these circumstances, reversal seems inappropriate. We conclude, therefore, that the conviction should be affirmed.

### III

We all agree that more effort is needed in future cases to ensure that the issue of responsibility is decided upon sufficient information. Unfortunately, we have no easy solution. The history of the insanity defense in this jurisdiction shows that the misuse of conclusory labels has always been a central concern. The M'Naghten test, which we have quoted above,[16] had two major defects. First, it encouraged psychiatrists to say whether the defendant knew "right" from "wrong," terms which have no particular medical meaning. Consequently, because the psychiatrist's attention was focused on these judgments and not on the medical facts, the jury was diverted from and perhaps even deprived of his expert knowledge. Second, and perhaps more important, the right-wrong test required psychiatrists to make a moral judgment about the defendant. It has often been argued that in the guise of an expert, the psychiatrist became the thirteenth juror, and unfortunately the most important one.[17] Thus, the labels of "right and wrong" precluded the jury from considering all the relevant information and also encouraged the psychiatrist to impose his moral judgment upon the jury.[18]

In Part I we described the steps taken in Durham and McDonald to enable the jury to consider all the relevant information about the defendant. Durham and McDonald were also attempts to clarify the respective roles of the expert[19] and the jury by reducing the emphasis on conclusory labels. We thought the new test announced in Durham would allow the expert to testify in medical terms familiar to him and to his profession. The jury would no longer be forced to focus on the conclusory labels used by the expert.

Soon after Durham we found that, although the jury was being given more information, still too much emphasis was being placed upon the labels used by the psychiatrist, upon whether he concluded that the defendant did or did not have a "mental illness." In Carter v. United States[20] we pointed out again that Durham was designed to eliminate this kind of labeling.

Unexplained medical labels—schizophrenia, paranoia, psychosis, neurosis, psychopathy—are not enough. Description and explanation of the origin, development and manifestations of the alleged disease are the chief functions of the expert witness. The chief value of an expert's testimony in this field, as in all other fields, rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion; in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in his mere expression of conclusion. * * * Durham was intended to restrict to their proper medical function the part played by the medical experts.[21]

This warning was not effective enough, so in McDonald v. United

16. See text accompanying note 5, supra.

17. See, e. g., GLUECK, supra note 2, at 34; Suarez, A Critique of the Psychiatrist's Role as Expert Witness, 12 J. FOR.SCI. 172, 177 (1967); Address by Prof. Alan M. Dershowitz, Psychiatry in the Legal Process: A Knife That Cuts Both ways, Harvard Law School Sesquiecentennial Celebration, Sept. 23, 1967.

18. See Carter v. United States, 102 U.S. App.D.C. 227, 235–237, 252 F.2d 608,

616–618; Durham v. United States, supra note 6, 94 U.S.App.D.C. at 236–240, 214 F.2d at 869–874.

19. The term "expert" is not necessarily limited to psychiatrists. See, e.g., Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637 (1962).

20. Supra note 18.

21. Id. at 236, 252 F.2d at 617.

States [22] we gave the terms "disease" and "defect" a *legal* definition independent of their medical meanings.

Our eight-year experience under *Durham* suggests a *judicial* definition, however broad and general, of what is included in the terms "disease" and "defect." In *Durham*, rather than define either term we simply sought to distinguish disease from defect. Our purpose now is to make it very clear that neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect. What psychiatrists may consider a "mental disease or defect" for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility. Consequently, for that purpose the jury should be told that a mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls. Thus the jury would consider testimony concerning the development, adaptation and functioning of these processes and controls.

We emphasize that, since the question of whether the defendant has a disease or defect is ultimately for the triers of fact, obviously its resolution cannot be controlled by expert opinion. The jury must determine for itself, from all the testimony, lay and expert, whether the nature and degree of the disability are sufficient to establish a mental disease or defect as we have now defined those terms. What we have said, however, should in no way be construed to limit the latitude of expert testimony.[23]

We clearly separated the legal and moral question of culpability from the medical-clinical concept of illness. We hoped thereby to separate the roles of the psychiatrist and the jury, with the former stating medical-clinical facts and opinions and the latter making the judgments required by the legal and moral standard.[24] Also, we hoped that the expert's conclusion would not be so heavily weighted in the jury's minds if we made plain that the expert and the jury had different judgments to make.

Even after *McDonald*, though, we allowed the experts to state whether they thought the defendant had a mental disease or defect. We assumed that the expert could separate the medical judgments which he was supposed to make from the legal and moral judgments which he was not supposed to make. It

---

22. *Supra* note 10.

23. *Id.* 114 U.S.App.D.C. at 124, 312 F.2d at 850–851. An alternative to *Durham-McDonald* would be to make the ultimate test whether or not it is just to blame the defendant for his act. If the question were simply whether it is "just" to "blame" the defendant, then mental illness, productivity, ability to control oneself, etc., might be factors which the jury could consider in reaching its conclusion on the justness of punishment. Since the words "just" and "blame" do not lend themselves to refined definition, the charge to the jury under this test probably would not be detailed. But the words that have been used in other charges, such as "defect of reason," "disease of the mind," "nature and quality of the act," "behavior controls," "mental disease or defect," "capacity * * * to appreciate the criminality of his conduct," and "capacity to conform his conduct to the requirements of law," are also vague—the chief difference being that these words give a false impression of scientific exactness, an impression which may lead the jury to ignore its own moral judgment and defer to the moral judgment of scientific "experts." However, we are unaware of any test for criminal responsibility which does not focus on the term "mental illness," or some closely similar term. This focus may be unfortunate, but we are not deciding that question now, and are not proposing to abandon the term. Contrast Dershowitz, supra note 17, recommending that "no legal rule should ever be phrased in medical terms * * *."

24. *See* Rollerson v. United States, 119 U. S.App.D.C. 400, 402, 343 F.2d 269, 271 (1964); Hawkins v. United States, *supra* note 1, 114 U.S.App.D.C. at 44, 46–47, 310 F.2d 849, 851–852 (1962).

has become abundantly apparent that this theory has not worked out. Too often conclusory labels—both medical and legal—have substituted, albeit unwittingly, for the facts and analysis which underlie them.[25] The transcript in this case illustrates that they may have served more to confuse the jury than to guide it. Also, testimony in terms of "mental disease or defect" seems to leave the psychiatrist too free to testify according to his judgment about the defendant's criminal responsibility.[26]

■ This kind of testimony does not give the jury a satisfactory basis for determining criminal responsibility. A proper adjudication requires that the jury be fully informed about the defendant's mental and emotional processes and, insofar as it affects these processes,

his social situation.[27] Of course, we cannot hope to obtain *all* the relevant information about a defendant. We cannot explore in full the effects of his genetic structure, his family relationships, his upbringing in slum or suburb. But within the limits imposed by the courtroom context and the level of scientific knowledge we should provide the jury with as much of this information as is reasonably available. We are not excused from doing what we can do simply because there are things we cannot do.

With the relevant information about defendant, and guided by the legal principles enunciated by the court, the jury must decide, in effect, whether or not the defendant is blameworthy. Undoubtedly, the decision is often painfully difficult, and perhaps its very difficulty ac-

---

25. *See, e.g.*, Henderson v. United States, 123 U.S.App.D.C. 380, 384–387, 360 F.2d 514, 518–521 (1966) (concurring opinion); Rollerson v. United States, *supra* note 24, 119 U.S.App.D.C. at 401–407, 343 F.2d at 270–276; Heard v. United States, 121 U.S.App.D.C. 37, 44–45, 348 F.2d 43, 50–51 (1965) (separate statement on rehearing en banc); Jackson v. United States, 118 U.S.App.D.C. 341, 344–347, 336 F.2d 579, 582–585 (1964) (concurring opinion adopted in 122 U.S. App.D.C. 324, 331, 353 F.2d 862, 869 (1965)); Hawkins v. United States, *supra* note 1; Calloway v. United States, 106 U.S.App.D.C. 141, 142 & n. 1, 270 F.2d 334, 335 & n. 1.

Practically all of the defendants concerned in these cases are indigents who must rely on Government doctors. Our experience during the past thirteen years suggests that these doctors may not be able to provide us with adequate information. Saint Elizabeths and D. C. General are overworked and understaffed. We do not know how far the situation would change if we dealt primarily with defendants who could afford private psychiatric help.

The Judicial Conference of the District of Columbia has condemned the use of conclusory labels in hospital competency reports. In October 1965, the Conference recommended that "The report of a court-ordered pretrial mental examination should be made in substantial detail, recounting what was done to get at the facts concerning the accused's mental condition and what those facts are, not merely the conclusions the psychiatrists

have drawn from these facts." See Judicial Conference of the District of Columbia, Report of the Committee on Problems Connected with Mental Examinations of the Accused in Criminal Cases, Before Trial ii, 56 (1966). And by letter of May 19, 1967, Chief Judge Curran directed the Superintendent of Saint Elizabeths to implement this recommendation.

26. In a recent habeas corpus proceeding challenging a ten-year old Air Force court martial, a psychiatrist admitted that at trial he reversed his original opinion that defendant was not criminally responsible because he believed that, if acquitted by reason of insanity, the defendant would be prematurely released from a mental hospital and would "kill again." Transcript of Proceedings, Edmondson v. United States, Civil No. 15–911–1, 125–156 (W.D.Mo. March 31, 1967) (Oliver, J.). As a result of the testimony at the habeas corpus proceeding, the Air Force condemned the psychiatrist's reliance on "socio-moral considerations of his own devising" and set aside the sentence. Proceedings of the Air Force Board for the Correction of Military Records, Case of Clifford W. Edmondson, No. 67–3380, 12 (1967).

27. *See, e.g.*, McDonald v. United States, *supra* note 10, 114 U.S.App.D.C. at 124, 312 F.2d at 851; Carter v. United States, *supra* note 18, 102 U.S.App.D.C. at 236–237, 252 F.2d at 617–618; Rollerson v. United States, *supra* note 24, 119 U.S. App.D.C. at 403–404, 343 F.2d at 272–273.

counts for the readiness with which we have encouraged the expert to decide the question. But our society has chosen not to give this decision to psychiatrists or to any other professional elite but rather to twelve lay representatives of the community. The choice was not made on a naive assumption that all jurors would be fully capable of dealing with these difficult questions or with the underlying information. Nonetheless, this decision, along with many equally difficult ones in other areas, ranging from negligence to antitrust, was given to a jury.[28] As long as this is our system, we should try to make it work.

The trial judge should limit the psychiatrists' use of medical labels— schizophrenia, neurosis, etc.[29] It would be undesirable, as well as difficult, to eliminate completely all medical labels, since they sometimes provide a convenient and meaningful method of communication. But the trial judge should ensure that their meaning is explained to the jury and, as much as possible, that they are explained in a way which relates their meaning to the defendant.[30]

28. The phrase "mental disease or defect" has been criticized for not giving enough guidance to the jury. In this regard the phrase is similar to other conclusory labels in the law. For example, "negligence" is a vague label given content primarily by the conclusions for which it stands. A person is "negligent" if he is at "fault" (blameworthy?), or if he has not exercised "due care," or if he has not met some standard of reasonable conduct. We are comfortable with a concept like negligence because we understand that it is a conclusion based on other considerations. Similarly, we can accept the term "mental disease or defect" if we understand what it represents.

29. The Department of Defense has directed medical officers to avoid "the use of scientific jargon" in court martial proceedings. "The witness should use the approximate lay equivalents, or, if technical terms are unavoidable, should define them." Moreover, the expert witness is instructed that it is his "obligation to make his method and techniques intelligible to the court" and that he "should never hesitate to admit before a court the limitations of his medical knowledge and experience." DEPARTMENT OF DEFENSE, PSYCHIATRY IN MILITARY LAW 35, 37 (approved draft 1967). In the Soviet Union, courts reject psychiatric reports which employ too many technical and evaluative terms. BERMAN, JUSTICE IN THE U.S.S.R. 322–323 (rev. ed. 1963).

30. A diagnosis of the defendant's condition, while involving conclusions of a kind, is admissible even though a jury is not bound by a diagnosis or a particular diagnostic label on a mental disorder. The jury wants and needs help from the expert, but it does not help a jury of laymen to be told of a diagnosis limited to the esoteric and swiftly changing vocabulary of psychiatry. Every technical description ought to be "translated" in terms of "what I mean by this," followed by a down-to-earth concrete explanation in terms which convey meaning to laymen. A psychiatrist who gives a jury a diagnosis, for example, of "psychoneurotic reaction, obsessive compulsive type" and fails to explain fully what this means, would contribute more to society if he were permitted to stay at his hospital post taking care of patients.

* * * * *

It is at this point where trial counsel's responsibility comes into play. It is for him to elicit, either by direct or cross-examination, "the material from which [the psychiatric] opinion is fashioned" and the steps by which the raw material of the tests, observations and other data led to the diagnosis and opinion. The value of an expert opinion can rise no higher than the facts and premises on which it is based. But it is only a rare medical witness who is so skilled in the forensic art that he can present testimony adequately even where there is inept interrogation by counsel. If trial counsel fail in their role the trial judge would be well advised to urge them, out of the presence of the jury, to explore and develop the subject so that the witness can translate all of his medical observations to the jury. This is the area in which the deterioration if not breakdown of the trials of these "insanity" cases is to a large extent the fault of the trial counsel. If lawyers want the views of the experts to be accepted by lay jurors their first duty is to draw out expert testimony in terms which are intelligible and meaningful. [Campbell v. United States, 113 U.S.App.D.C. 260 at 277–78, 307 F.2d 597 at 614–15 (1962) (Burger, J., dissenting).]

The problem with labels, such as, "product" and "mental disease or defect," is even more difficult. Because these labels are employed in the legal test for responsibility, there is a danger that the psychiatric witness will view them as a legal-moral rather than a medical matter. There are two possible solutions. We could simply prohibit testimony in terms of "product" and "mental disease or defect." Or we could clearly instruct the expert to stick to medical judgments and leave legal-moral judgments to the jury.

A strong minority of this court has consistently advocated that psychiatrists be prohibited from testifying whether the alleged offense was the "product" of mental illness, since this is part of the ultimate issue to be decided by the jury.[31] We now adopt

The need for judicial supervision may be heightened by the "breakdown" of the adversary system in these cases, a failure caused largely by the complexity of the issue, the indigency of the defendant, or both. See Jackson v. United States, *supra* note 25 [concurring opinion adopted in 122 U.S.App.D.C. 324, 331, 353 F. 2d 862, 869 (1965)]. Even if the adversary system were more viable, our holding on this point would be amply supported by the rule that expert opinion should have an ascertainable basis in fact. *See, e.g.,* Rollerson v. United States, *supra* note 24, 119 U.S.App.D.C. at 401–402, 343 F.2d at 270–271 and materials cited therein; Hawkins v. United States, *supra* note 1, 114 U.S.App.D.C. at 46–47, 310 F.2d at 851–852; Calloway v. United States, *supra* note 25, 106 U.S. App.D.C. at 142 n. 1, 270 F.2d at 335 n. 1; Winn v. United States,, 106 U.S.App. D.C. 133, 135, 270 F.2d 326, 328 (1959); Giant Food Stores, Inc. v. Fine, 106 U.S. App.D.C. 95, 269 F.2d 542 (1959); Blunt v. United States, 100 U.S.App.D.C. 266, 275, 244 F.2d 355, 364 (1957); Raub v. Carpenter, 17 App.D.C. 505, 512–513 (1901), aff'd, 187 U.S. 159, 161, 23 S.Ct. 72, 47 L.Ed. 119 (1902); Turner v. American Security & Trust Co., 29 App. D.C. 460, 467–468 (1907), aff'd, 213 U.S. 257, 258, 260–261, 29 S.Ct. 420, 53 L.Ed. 788 (1909); Breland v. United States, 372 F.2d 629, 633 (5th Cir. 1967); Balaban & Katz Corp. v. *Commissioner of Internal Revenue,* 30 F.2d 807, 808 (7th Cir. 1929). Indeed McCormick says that the "core" of the opinion evidence rule would be preserved by a rule "prescribing that the trial judge in his discretion may require that a witness, before giving testimony in terms of inference on general description, shall first give the concrete details upon which the inference or description is founded, so far as feasible. [Citing Uniform Rules of Evidence, Rule 57.]" McCormick, Evidence 24 (1954).

31. In a number of cases in this court appellants have protested the "trial by

label" especially the practice of allowing a psychiatrist to tell the jury that the defendant's act, for which he is on trial, is *not* the "product" of mental disease. The reason is obvious: when a qualified expert psychiatrist with the mantle of professional standing, and medical degrees in a high calling, tells a jury that the act charged is *not* the "product" of any "mental disease" he is stating a conclusion *that the defendant ought to be found guilty.* As I view it, no witness, expert or otherwise, should ever be allowed to state that conclusion to a jury. * * *

I suggest also that if contending counsel and the psychiatrists are forbidden to take the "easy way" by testifying on the causal connection in terms of "product" this very fact will *compel* compliance with our unanimous opinion in Carter * * *

The pernicious practice of allowing the conclusion opinions on "product" by experts, apart from its other vices, has operated to *narrow* and constrict the scope of psychiatric testimony when what we want is to *broaden* that scope. * * * The function of the psychiatrist is not to try to tell the jurors what verdict they should render but rather to portray, as fully and completely as possible, the mental and emotional makeup of the defendant, how his emotional and intellectual processes work and how they affected his capacity to control his conduct, both generally and in the specific situation surrounding the crime charged. They should try to portray the "inner man" as best they can without fanciful speculation. The opinions must be based on "reasonable medical certainty" which has always been the legal standard for expert medical opinions. The experts cannot be expected to know all these answers as to every defendant but these are the areas in which they should be examined and cross-examined extensively. Only by doing this can we avoid the sterile, atrophying process of letting these trials continue to be

that view. The term "product" has no clinical significance for psychiatrists. Thus there is no justification for permitting psychiatrists to testify on the ultimate issue. Psychiatrists should explain how defendant's disease or defect relates to his alleged offense, that is, how the development, adaptation and functioning of defendant's behavioral processes may have influenced his conduct. But psychiatrists should not speak directly in terms of "product," or even "result" or "cause."

It can be argued that psychiatrists should also be prohibited from testifying whether the defendant suffered from a "mental disease or defect," since this too is part of the ultimate issue. But unlike the term "product," the term "mental disease or defect" may have some clinical significance to the psychiatrist. Moreover, prohibition of testimony about

"mental disease or defect" would not be a panacea. Other words and other concepts may similarly be transformed into labels. For example, in *McDonald* we spoke about "abnormal" conditions of the mind, about impairment of mental and emotional processes, and about control mechanisms.[32] The transcript of this trial illustrates how easily these concepts can become slogans, hiding facts and representing nothing more than the witness's own conclusion about the defendant's criminal responsibility.

At least for now, rather than prohibit testimony on "mental disease or defect," we shall try to help the psychiatrists understand their role in court, and thus eliminate a fundamental cause of unsatisfactory expert testimony. A copy of the explanatory instruction to psychiatrists which we have set out in the Appendix should accompany all or-

contests of labels in which the prosecution strains to get at least one expert to say "no disease" or "no product" and defense strains for the opposing labels. The natural tendency of advocates is to stop as soon as they have made a record which will assure that they will get to the jury—or get a directed verdict. The ultimate responsibility—and power—to prevent witnesses from violating rules of evidence lies with judges. [Campbell v. United States, *supra* note 30 [113 U.S. App.D.C.] at 276–77, 307 F.2d at 613–14 (Burger, J., dissenting).]

See also Blocker v. United States, 110 U.S.App.D.C. 41, 50–52, 288 F.2d 853, 862–864 (1961) (en banc) (Burger, J., concurring).

There are many cases in this jurisdiction holding that an expert cannot testify on the ultimate issue before the jury. *See, e.g.,* United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617 (1935); Simmons v. United States, 92 U.S.App.D.C. 122, 206 F.2d 427 (1953); Deaver v. United States, 81 U.S.App.D.C. 148, 155 F.2d 740 (1946); Henkel v. Varner, 78 U.S.App.D.C. 197, 138 F.2d 934 (1943); Grober v. Capital Transit Co., 119 F.Supp. 100 (D.C.D.C.1954). And *cf.* Engle v. Stull, 126 U.S.App. D.C. 291, 377 F.2d 930 (1967) (Fahy, J., concurring). There are cases to the contrary, but they seem to be based on the theory that the conclusion was simply a summary of the underlying facts. See,

*e.g.,* Ewing v. United States, 77 U.S.App. D.C. 14, 23, 135 F.2d 633, 642 (1942); MacAfee v. Higgins, 31 App.D.C. 355 (1908); Turner v. American Security & Trust Co., *supra* note 30; In re Cottrill's Estate, 39 F.Supp. 689 (D.C.D.C. 1941). A conclusion about "product" is not merely a summary of the underlying medical psychological and social facts. It is an opinion on whether or not the defendant should be found guilty. " * * * [T]here is a kind of statement by the witness which amounts to little more than an expression of his belief as to how the case should be decided. * * * Such extreme expressions as these all courts, it is believed, would exclude. [Citing cases.] There is no necessity for such evidence, and to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witnesses." McCORMICK, EVIDENCE 25 (1954). According to McCormick, even Dean Wigmore, the leading proponent of opinion testimony, would exclude this kind of conclusion, *Id.* at 26.

If testimony about "product" were prohibited, then, the reason would not simply be that it is part of the ultimate conclusion but that it is a legal and moral conclusion about which psychiatrists and other experts have no more expertise than jurors. See Suarez, *supra* note 17, at 178.

32. *Supra* note 10, 114 U.S.App.D.C. at 124, 312 F.2d at 851.

ders requiring mental examinations so that the psychiatrists will be advised of the kind of information they are expected to provide. To ensure that counsel and the jury are also so advised, the trial judge should give the explanatory instruction in open court to the first psychiatric witness immediately after he is qualified as an expert. It need not be repeated to later witnesses. Some of it will be repeated in the court's instruction to the jury at the end of the trial, but we think the jury should hear it in full and *before* the testimony. Although an instruction at this juncture is not usual, this court has required one in somewhat analogous circumstances.[33]

Affirmed.

### APPENDIX

Court's Instruction to Expert Witness in Cases Involving the "Insanity Defense."

Dr. _____, this instruction is being given to you in advance of your testimony as an expert witness, in order to avoid confusion or misunderstanding. The instruction is not only for your guidance, but also for the guidance of counsel and the jury.

Because you have qualified as an expert witness your testimony is governed by special rules. Under ordinary rules, witnesses are allowed to testify about what they have seen and heard, but are not always allowed to express opinions and conclusions based on these observations. Due to your training and experience, you are allowed to draw conclusions and give opinions in the area of your special qualifications. However, you may not state conclusions or opinions as an expert unless you also tell the jury what investigations, observations, reasoning and medical theory led to your opinion.

As an expert witness, you may, if you wish and if you feel you can, give your opinion about whether the defendant suffered from a mental disease or defect. You may then explain how defendant's disease or defect relates to his alleged offense, that is, how the development, adaptation and functioning of defendant's behavioral processes may have influenced his conduct. This explanation should be so complete that the jury will have a basis for an informed judgment on whether the alleged crime was a "product" of his mental disease or defect. But it will not be necessary for you to express an opinion on whether the alleged crime was a "product" of a mental disease or defect and you will not be asked to do so.

It must be emphasized that you are to give your expert diagnosis of the defendant's mental condition. This word of caution is especially important if you give an opinion as to whether or not the defendant suffered from a "mental disease or defect" because the clinical diagnostic meaning of this term may be different from its legal meaning. You should not be concerned with its legal meaning. Neither should you consider whether you think this defendant should be found guilty or responsible for the alleged crime. These are questions for the court and jury. Further, there are considerations which may be relevant in other proceedings or in other contexts which are not relevant here; for example, how the defendant's condition might

---

33. Coleman v. United States, 125 U.S. App.D.C. 246, 249, 371 F.2d 343, 345–346 (1966), cert. denied, 386 U.S. 945, 87 S.Ct. 979, 17 L.Ed.2d 875 (1967).

The writer of this opinion would make the following observations for himself. It may be that this instruction will not significantly improve the adjudication of criminal responsibility. Then we may be forced to consider an absolute prohibition on the use of conclusory legal labels. Or it may be that psychiatry and the other social and behavioral sciences cannot provide sufficient data relevant to a determination of criminal responsibility no matter what our rules of evidence are. If so, we may be forced to eliminate the insanity defense altogether, or refashion it in a way which is not tied so tightly to the medical model. See note 23, *supra*. But at least we will be able to make that decision on the basis of an informed experience. For now the writer is content to join the court in this first step.

change, or whether he needs treatment, or is treatable, or dangerous, or whether there are adequate hospital facilities, or whether commitment would be best for him, or best for society. What is desired in this case is the kind of opinion you would give to a family which brought one if its members to your clinic and asked for your diagnosis of his mental condition and a description of how his condition would be likely to influence his conduct. Insofar as counsel's questions permit, you should testify in this manner.

When you are asked questions which fall within the scope of your special training and experience, you may answer them if you feel competent to do so; otherwise you should not answer them. If the answer depends upon knowledge and experience generally possessed by ordinary citizens, for example questions of morality as distinguished from medical knowledge, you should not answer. You should try to separate expert medical judgments from what we may call "lay judgments." If you cannot make a separation and if you do answer the question nonetheless, you should state clearly that your answer is not based solely upon your special knowledge. It would be misleading for the jury to think that your testimony is based on your special knowledge concerning the nature and diagnosis of mental conditions if in fact it is not.

In order that the jury may understand exactly what you mean, you should try to explain things in simple language. Avoid technical terms whenever possible. Where medical terms are useful or unavoidable, make sure you explain these terms clearly. If possible, the explanation should not be merely general or abstract but should be related to this defendant, his behavior and his condition. Where words or phrases used by counsel are unclear, or may have more than one meaning, you should ask for clarification before answering. You should then explain your answer so that your understanding of the question is clear. You need not give "yes or no" answers. In this way any confusion may be cleared up before the questioning goes on.

Some final words of caution. Because we have an adversary system, counsel may deem it is his duty to attack your testimony. You should not construe this as an attack upon your integrity. More specifically, counsel may try to undermine your opinions as lacking certainty or adequate basis. We recognize that an opinion may be merely a balance of probabilities and that we cannot demand absolute certainty. Thus you may testify to opinions that are within the zone of reasonable medical certainty. The crucial point is that the jury should know how your opinion may be affected by limitations of time or facilities in the examination of this defendant or by limitations in present psychiatric knowledge. The underlying facts you have obtained may be so scanty or the state of professional knowledge so unsure that you cannot fairly venture any opinion. If so, you should not hesitate to say so. And, again, if you do give an opinion, you should explain what you did to obtain the underlying facts, what these facts are, how they led to the opinion, and what, if any, are the uncertainties in the opinion.

FAHY, Circuit Judge (concurring specially in affirmance).

## Part I

I have no serious problem with Part I of the opinion of the court, though I am not convinced of the accuracy of the view there implied that after *Durham* some doctors in defining mental illness were, though perhaps unwittingly, advancing their own notions about blame. I agree, however, that *McDonald* was helpful in clarifying the respective role of witness and jury; and I shall comment later with respect to blame in this type of case.

## Part II

As to Part II of the opinion I too would have welcomed fuller information

about the defendant.[1] I do not feel justified, however, in joining in the court's appraisal of the testimony on the issue of defendant's mental condition. It is true that labels were used by the psychiatrists but the record I think discloses rather full explanations of their medical terminology.

In addition to the opinion's excerpt from Dr. Owens' explanation of "passive-aggressive personality," which seems to me to clarify his views, the doctor went further in explanation. I dislike to burden the opinion with lengthy quotations from his testimony, but do need to be indicative. Thus, the following appears during his examination:

Q Now, doctor, do you feel that Mr. Washington has any personality de-defect?

A Not in the sense of "defect." I would prefer to say he has personality problems, that is a difficulty in getting along or adjusting, that probably the difficulties that he experiences in relating adequately to other people are more severe or more extreme than the average person has.

Q Is it accurate to say that he has a personality disorder?

A I generally would prefer not to say "disorder," because when you say "disorder," this denotes that you mean something is wrong, that is a disease or an illness or some disorder. I would prefer to say that he has a personality, a type of personality.

Q What type of personality do you think he has?

A My opinion would be that he was generally or would generally be described as somewhat schizoid, that is, he has difficulty relating to people.

He gets angry if he does not have his way. He tends at times to spend his time alone, or has difficulty relating to people with some aggression

when he does not—when things do not go exactly his way, he acts out in an aggressive manner.

\* \* \* \* \* \*

Q Doctor, do you believe, based upon the examination of Mr. Washington and the records that he would be classified with this terribly ambiguous term "normal"—is he normal?

A Well, a lot depends, if you mean by "normal," that he has no mental illness, then he would be normal in my opinion.

However if you mean normal by his behavior, being socially acceptable, then he would not be normal.

This was pursued still further in ordinary language of explanation.

When the doctor used the term "sociopathic symptomology" he was asked its meaning and replied:

A By sociopath, we mean an individual who is antisocial. That is a type of personality who acts out in an anti-social way, has little control over his desires and his needs.

He is constantly repetitiously being involved in criminal activity. He has little guilt. He does not feel that things are wrong. The only time he feels it is wrong is when he gets caught.

Q Little anxiety?

A Very little. They usually act out, behave in an anti-social manner before they get anxiety.

Q Rape is consistent with a sociopathic personality, is not that correct?

A Any crime would be consistent with it. There are sociopaths who commit crimes and sociopaths who do not.

During Dr. Hamman's testimony for the United States he was asked, "Could you tell us in psycho-dynamic terms how you analyze Mr. Washington's personality?" He responded:

1. As to the Cedar Knolls record, it is clear that counsel's decision not to press for its admission in evidence was deliber- ate and well considered. I have no basis for concluding that a different decision would have been helpful to defendant.

A I think he is an individual, it is my opinion that he is an individual who does have impulses. He does have drives. Who has very little regard for the people. And when he wants something, he takes it.

Q He will act out these impulses?

A Yes.

Q The impulses, if they are strong, he will act strongly?

A Yes.

\* \* \* \* \* \*

Q Psychiatrically considering this picture of Mr. Washington, don't you think he has a personality difficulty or personality disorder?

A No. I think he has personality problems. But I don't think they are marked to the extent that I would call them character neurotic.

Q I don't understand what you mean, doctor. Would you explain?

A Well, he is not the best adjusted person in the world.

\* \* \* \* \* \*

A He is a very aggressive individual, there is no question about that. But I do not think he has a mental illness. I do not think he has—I do not think he shows symptoms that would justify a diagnosis of a character disorder, personality disorder, or a neurosis.

Q Doctor, isn't it all a question of degree in reaching your diagnostic impression?

A Absolutely right.

\* \* \* \* \* \*

Q And isn't this behavior, which is this aggressive behavior, directly caused by this personality problem which is of a sociopathic nature?

A It is caused—no.

Q No?

A Look, anything that any of us do is caused by our personality, by our character. I would not know whether you want to call this illness or not.

It seems to me the witnesses' explanations of their opinions were understandable. One might not be persuaded by them, but that is a different matter. Doctors Owens and Hamman, both witnesses for the Government, readily conceded impulsive conduct by defendant, his "lack of brakes" in his sexual urge; but in their opinion this was not due to mental disease and they explained in understandable language the situation as they saw it. I think it was fairly put to the jury on the evidence to decide whether defendants' weakness in sexual matters amounted to mental disease excusing him from criminal responsibility, or, on the other hand, was a character or personality weakness which did not absolve him of such responsibility. I agree with the court that we should seek improvement, and that the witnesses should inform the jury clearly of the meaning of their medical terms, and of the basis for their opinions; but I do not feel justified in saying that the use of labels, when considered with all the testimony, left the jury confused in this case.

### Part III

I have no particular comment upon the court's analysis of the development of the law in this jurisdiction which led to our unanimous *McDonald* decision. There we pointed out the needed distinction between a courtroom test and a clinical test, to be made clear to the jury in deciding the issue of criminal responsibility.

As to this part of the opinion I add: (1) I have no difficulty in adhering to our decision permitting the psychiatrist to give his opinion as to the existence of a mental disease or defect, provided the basis for the opinion is explained to the jury in understandable terms and has substantial factual basis of which the jury is also advised by the witness; and (2) I think it probable as matters have developed that to permit the witness to give his opinion in exact "product" language is likely to give undue weight to his view on the ultimate issue, tending to detract from the responsibility of the jury. But I do not wish to decide in the abstract that in a particular case, in explaining the relation of the disease or defect, if any, to the conduct charged,

should the witness find it useful to speak in "causal" language, or use the term "product" in that connection, I would for that reason alone find error. We have not in the past, and I do not now, construe United States v. Spaulding, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617, to bar such testimony in this type of case. The issue there was whether Spaulding was totally and permanently disabled within the meaning of a federal policy of insurance and statute. The record was replete with factual evidence as to his physical condition and his activities. The Court stated that the issue of total and permanent disability was the ultimate question to be decided by the jury, was not a question to be resolved by opinion evidence, and the experts ought not to have been asked or allowed to state their conclusions "on the whole case." The particular scope of this ruling, however, is indicated by the decisions the Court cites, of which Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U.S. 469, 472, 24 L.Ed. 256 is illustrative. There the Court said:

> The subject of proposed inquiry was a matter of common observation, upon which the lay or uneducated mind is capable of forming a judgment. In regard to such matters, experts are not permitted to state their conclusions. On questions of science their opinions are received, for in such questions scientific men have superior knowledge, and generally think alike. Not so in matters of common knowledge.

And see our own case of Henkel v. Varner, 78 U.S.App.D.C. 197, 138 F.2d 934.

In the present case to give an opinion in terms of product or cause[2] is not to state an expert conclusion on "the whole case," for independent evidence supporting the existence of mental disease or defect is required before the causal issue is reached. For the same reason the product or causal issue is not the whole of the ultimate issue, which is a combination of the two factors, the factor of mental condition and its relation to the act charged. More important, such an opinion does not relate to a matter of common knowledge or observation as to which the expert in psychiatry does not often have knowledge superior to that of the "lay or uneducated mind." True it is that the jury of laymen must form a judgment on the issue of criminal responsibility, but this does not bar from the jury such assistance in forming that judgment as a person specially qualified by education and experience in psychiatry might afford. Such a problem as we now consider is not like a case of physical disability, as was *Spaulding*. While I think for the reason I have given the expert ordinarily should avoid testifying in the language of "product," I do not think such testimony is barred by *Spaulding*.

I join in the requirement of an instruction to the witness, referred to in Part III of the opinion. This seems to me a very desirable and helpful development which I hope the trial judges as well as counsel and witnesses will welcome. I assume the substance rather than the exact form of instruction as it appears in Appendix A would suffice.

A few remarks are offered upon the court's reference to blameworthiness and moral judgment. Blame, in the sense and to the extent of criminal responsibility, does not attach where, under the standards applicable to the defense of insanity,[3] the jury has at least a reasonable

---

2. As to the meaning of these terms and their relationship one to the other see Carter v. United States, 102 U.S.App. D.C. 227, 236, 252 F.2d 608, 617.

3. In Holloway v. United States, 80 U.S. App.D.C. 3, 148 F.2d 665, in referring to the tests of criminal responsibility in these cases, the court said that the application of "these tests, however they are phrased, to a borderline case can be nothing more than a moral judgment that it is just or unjust to blame the defendant for what he did * * *." In *Durham* we said that our traditions require that where the otherwise criminal acts stem from and are the product of a mental disease or defect "moral blame shall not attach, and hence there will not be criminal responsibility."

**462**

doubt that the act stemmed from a mind free of any mental disease or defect which was causally related to the commission of the act. But this basic moral decision is made by society, not by juries. Society, acting through law, has established the defense of insanity, which relieves the accused of criminal responsibility for an act which results from a mental disease or defect.[4] Whether or not this defense is established in a particular case is a factual decision to be made by the jury on the evidence bearing on the mental condition of the accused and on the relation of that condition to the conduct charged. In reaching this factual decision the jury is aware that blame—to the extent of criminal responsibility—will or will not attach under the law. In this very limited sense perhaps the jury's decision can be said to be a moral judgment, but only because the jury's factual decision does or does not bring the defendant within the coverage of the law's moral decision. The jury is called upon to decide on evidence respecting the defense of insanity. The jury is not free to express by its verdict its view of blame or morals unrelated to its appraisal of the evidence on the issue of insanity.

Juries generally, not only in these cases, are influenced by what they think is right and just in the context of the facts and law of the case they decide. Their task is different here only because they are required often in these cases to make a difficult and subjective factual decision about the state of a person's mind, and its relation to particular conduct, "a subtle issue of a person's mental condition in relation to criminal responsibility." Douglas v. United States, 99 U.S.App.D.C. 232, 239, 239 F.2d 52, 59. It was this nature of the issue no doubt that led the court in *Holloway, supra* n. 3, to state that in a "borderline case" the application of the tests "can be nothing more than a moral judgment that it is just or unjust to blame the defendant * * *."

---

4. See Durham v. United States, 94 U.S.App.D.C. 228, 242, 214 F.2d 862, 876.