Robert I. ENGLE, Appellant,

v.

Emogene I. STULL et al., Appellees.

No. 20113.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 12, 1966.

Decided March 23, 1967.

---

3. The Local has been represented by counsel since the Trial Examiner issued his decision.

Mr. James F. Bromley, Washington, D. C., with whom Mr. James C. Gregg, Washington, D. C., was on the brief, for appellant.

Mr. M. Michael Cramer, Washington, D. C., with whom Mr. H. Thomas Sisk, Washington, D. C., was on the brief, for appellee Stull.

Mr. Louis M. Kaplan, Washington, D. C., with whom Mr. Lawrence E. Carr, Jr., Washington, D. C., was on the brief, for appellee Long.

Before FAHY, Circuit Judge, BASTIAN, Senior Circuit Judge, and COFFIN,* Circuit Judge for the United States Court of Appeals for the First Circuit.

COFFIN, Circuit Judge:

This appeal is taken from a judgment of the District Court, sitting without a jury, awarding plaintiff $21,000 for injuries sustained in a motorboat collision on the Potomac River on August 12, 1962.

■ Viewing the evidence most favorably to plaintiff, the facts are the following. Plaintiff, then twenty years old, was a clerk-stenographer employed by the Department of the Air Force at the Pentagon. She and six other persons had been invited by defendant Long for a Sunday boating excursion on the Potomac.

Long, who operated a marina and boat maintenance service, owned a twenty-foot Century Coronado motorboat cruiser powered with a 250 horsepower engine, on which he had had some 800 hours of running time. Defendant Engle owned an eighteen-foot 1953 Chris-Craft boat, originally equipped with a 120 or 131 horsepower engine. Shortly before the date of the accident, Long had installed a new 230 horsepower engine in Engle's boat and had taken it on test runs for about ten hours, during which time Engle had taken the wheel for two or three hours. One technique of testing was to turn the boat at high speed and cross its own wake. Long testified that on one such occasion he momentarily lost control. He advised Engle to "feel it [the new engine] out" before running it at high speed.

On the day of the accident, Engle and Long decided to cruise together in their respective boats, each carrying passengers. The day was clear and sunny, but the water was · slightly choppy, with waves of three to five inches. There were many other boats on the river. The two boats involved set out together, going downstream for a dining rendezvous at Sweden Point. After stopping once for gas at Alexandria, they stopped for a few minutes in midstream, then started up again. Long's boat, which had turned around, had lagged behind Engle's, but. proceeded to overtake it. In the words. of the plaintiff, Long's boat was "skipping along", "actually leaving the water at certain points".

Immediately before the accident, Engle's boat had passed Long's and was one hundred feet ahead and fifty feet to the left. Both boats were going between thirty and thirty-five miles per hour. They held this position and speed for about a quarter of a mile, or twenty-five to thirty seconds. Two to three minutes. earlier, an outboard motorboat had passed them, a few hundred yards to the left of Engle's boat, travelling in the opposite direction. There were approximately fifteen other boats within a two-block radius. At this point, defendant Long testified, he saw ahead of Engle's boat a wake or wave from another boat, a little bigger than the chop they had encountered since leaving Washington—a foot high or smaller. He then saw Engle's boat jump across the wake, go out of control, turn sharply to the right in the trough of the wake (toward Long), and overturn. Long remained "petrified" for an instant, then, when Engle's boat was about twenty feet away, turned his boat to the right, so abruptly that one of his passengers sitting on the bow fell overboard. The left edge of · the bottom of the capsized Engle boat collided with the left front gunwale of Long's boat.

Plaintiff was thrown into the water, where she remained for three quarters of an hour, during which she discovered that. her left thumb had been lacerated and was bleeding profusely. Diagnosis revealed that a digital nerve and tendon had been severed. Emergency surgery was. performed, as well as a subsequent operation to remove a neuroma, or tumor produced by the wild growth of nerve tissue. Plaintiff made some twenty-five visits to her doctors, pursued physical therapy treatment, bought drugs, and lost over

---

* Sitting by designation pursuant to Section 291(a) Title 28 U.S.Code.

three hundred hours of work. The trial court found that these items amounted to $1,564.70. She suffered, according to her surgeon, a permanent seventeen per cent disability in her thumb, and a permanent twenty-five per cent loss of function of her left hand.

She continues to suffer from both a deep aching myalgic or muscular pain and frequent acute neuralgic pain. The proportion of actual typewriting required by her job has increased since the accident. She tires more quickly, her productivity has decreased, and she is in frequent pain. Her supervisor often helps with her typing. Working in a security area, she finds it difficult and painful to tear up bulky documents for burning. Outside of working hours she has difficulty and pain in dressing, washing, doing household chores, carrying books to night school, and sleeping. Her life expectancy at the time of trial was fifty-five years.

The district judge, after making findings of fact summarizing the events above narrated, concluded that the negligence of defendant Engle was the sole proximate cause of plaintiff's injury and awarded damages of $21,000.

On this appeal, defendant Engle attacks the sufficiency of the evidence to support the finding of negligence on his part and the absence of negligence on the part of defendant Long; certain rulings on evidence at the trial; and excessiveness of the damages.

■ We think that the evidence, the salient parts of which we have summarized, was sufficient to sustain the findings. Defendant Engle's argument is that the accident could have been caused by his boat striking submerged debris and that plaintiff failed to meet her burden of introducing affirmative proof to remove causation from the realm of mere speculation. But the combination of Engle's lack of experience in handling his boat, after the installation of an engine of nearly double the power of the former one; his knowledge that a wake can cause a fast-moving boat to go out of control; the heavy traffic on the river; his passing an outboard boat to his left; the existence of a wake ahead of him; and his unslackening operation of his boat at thirty to thirty-five miles per hour seem to us to form a sufficient basis for a finding of negligence.[1] There was, indeed, no evidence of any other cause of the accident. This is not a case where plaintiff's proof amounted to nothing more than the occurrence of an accident.

■ As for the finding that defendant Long did not contribute to the accident, we cannot say that the district judge erred. Defendant Engle does not argue that Long was proceeding at too high a speed, that he was following Engle too closely, or that he was not keeping a proper lookout. He asserts, rather, that Long was negligent as a matter of law in hesitating for two or three seconds before turning and in failing to cut his throttle.[2] There is no evidence that these measures would have avoided the accident nor, even if they would, must we assume that a reasonable man would have acted in a crisis on split-second timing.

This brings us to the rulings at trial. The most substantial contention is that the judge erred in allowing plaintiff's counsel to use and refer to a Coast Guard accident report in impeaching Engle. Under the Motorboat Act of 1940, as amended, 46 U.S.C. § 526l(c), accident reports must be filed with the Coast Guard, unless an operator is required to file these reports with a state which has conformed to federal criteria governing a numbering system for motorboats. One of these criteria is that the state require reports of accidents involving boats num-

---

1. The applicable standard of care is that of a reasonable operator, whether we refer to general principles of tort law or to the Inland Rules of the Road, 33 U.S.C. §§ 151–232, 221, and the Federal Motorboat Act of 1940, as amended, 46 U.S.C. §§ 526–526t, 526l.

2. As defendant Long points out in his brief, a simultaneous effort both to stop and to turn sharply might well have caused a more serious accident.

**934**

bered by it and transmit such statistics to the Coast Guard. Federal Boating Act of 1958, 46 U.S.C. § 527a(c) (6). By regulation, individual accident reports submitted to the Coast Guard, "or copies or excerpts therefrom, will not be released." 46 C.F.R. § 173.10–1(b).

Maryland, the site of the accident alleged in the complaint, has an accident reporting law. Md.Ann.Code art. 14B, § 9 (Supp.1965). The law proscribes any reference to such reports in any judicial proceeding. Md.Ann.Code art. 14B, § 9(e) (Supp.1965).[3]

Defendant Engle argues that, after he testified that he did not recall seeing a wake at the time of the accident, it was improper for plaintiff's counsel to question him from and make reference to a Coast Guard report in which he had written that his boat had "hit a swell".

Were all the predicates established for invoking the Maryland law, we think it should be respected by the district court, notwithstanding the policy of the Federal Rules of Civil Procedure favoring the reception of evidence. Cf. Fed.R.Civ.P. 43 (a). We say this in the light of the principle of comity articulated in the Federal Boating Act of 1958, 46 U.S.C. §§ 527f, 527h(4), and the legislative history, S. Rep.No. 2340, 85th Cong., 2d Sess. (1958), U.S.Code Cong. & Admin.News, 1958, p. 5228, as well as policy reasons supporting state-created confidential relationships to induce full and accurate reporting of accidents.

The problem is that the Maryland statute is not in the case. To begin with, plaintiff, before trial, moved to compel the production by defendant Engle of copies of accident reports filed with the Coast Guard and with the Maryland Tidewater Fisheries Commission. In opposing the motion, defendant claimed, first, that the reports were privileged and, second, that if they were not privileged, they could be secured "from the United States Coast Guard or from Maryland Tidewater Fisheries Commission." The court, in its order to produce, characterized the motion as one to compel production of copies of statements given to the Coast Guard and ordered the documents named in the motion produced. In other words, before trial the focus was on reports filed both with the Coast Guard and with Maryland. There was no suggestion that no report had been filed directly with the Coast Guard.

The issue narrowed at trial where plaintiff's counsel asked defendant Engle: "Now, after the accident, within 30 days from the date of the accident, didn't you fill out and file a report with the United States Coast Guard concerning the causation of the accident?" Defendant answered, "Yes. I did." At this point counsel objected to reference to any report filed with the Coast Guard.

██ While counsel proceeded to argue on the basis that the report required by the Coast Guard had in fact been filed with Maryland, the evidence before the district judge— there being no attempt to change defendant's answer—was solely to the effect that the report in question was one which had been filed with the Coast Guard. This being so, the district judge properly allowed the report to be used in questioning defendant Engle. The federal regulation, proscribing release by the department, was of the same order as the census legislation in St. Regis Paper Co. v. United States, 1961, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240. There the Court approved an order compelling the production of a citizen's own file copy of his report to the Census Bureau, saying: "It [the Census Act] does not require petitioner to keep a copy of its report [to the Bureau] nor does it grant copies of

---

3. "The report of a boating accident herein required to be made shall not, during any judicial proceeding, be referred to in any way; it shall not be subject to subpoena nor admissible as evidence in any proceeding. Subject to these restrictions, information contained in a boating accident report and any statistical information based thereon will be made available upon request for official purposes to the United States Coast Guard and any federal agency successor thereto." (Acts 1960, ch. 69, Section 2.)

the report not in the hands of the Census Bureau an immunity from legal process. Ours is the duty to avoid a construction that would suppress otherwise competent evidence unless the statute, strictly construed, requires such a result." 368 U.S. at 218, 82 S.Ct. at 295. It specifically recognized that this form of proscription was not so broad as statutes similar to the Maryland statute in this case. *Id.* at 218, nn. 8, 9, 82 S.Ct. 289.

We do not see any injustice in applying this analysis to this case. Indeed, the use of the document in question can hardly be called even impeachment. Immediately prior to use of the document, this had been the testimony:

"Q. Now, did your boat hit a wake immediately before it went out of control? A. Did it strike a wake?

"Q. Yes, sir. A. There were wakes in the vicinity and I am sure that at the time or around that time that my boat went out of control that I was proceeding over wakes in the area. I do not recall whether I struck a wake at that time, I remember seeing wakes in front of me."

After colloquy between court and counsel, this was the testimony:

"Q. Sir, did you tell this to the Coast Guard, that this is how the accident happened? A. I recall filling out a Coast Guard report and giving them an explanation for what I thought possibly could have caused this accident, since they asked for one. I don't feel that I stated that it definitely caused the accident.

"Q. Did you not state that a possible reason for the accident was that you hit a swell or a wake? A. I did state that possibly I could have hit a swell and this could have caused the accident, yes."

We cannot say on this record that the questioning from the document contradicted defendant's testimony to the extent that any error, even if error was committed, was reversible, particularly in an action tried without a jury. To be sure, plaintiff's counsel in argument struck a more positive note than the evidence justified, in saying that defendant reported "in the Coast Guard report, that he hit a wake." But no objection was taken.

A second challenged ruling was that allowing an expert in motorboat operation to testify to the cause of the accident. There was no objection to his qualifications, nor, finally, to the basis in evidence of the components of the hypothetical question put to the witness. Objection was based on the allegation that causation was not a matter appropriate for expert opinion. But we do not think that common experience affords knowledge of such relevant matters, testified to by the expert here, as the distance from which a one-foot wake could be observed, the change in handling characteristics of a boat made to go faster than it was originally designed to go, the tendency of increased weight in the stern to make a boat "porpoise", the relation between engine revolutions per minute and speed, the relatively safe position of a following boat being ahead of the wake of a leading boat, and the length of time to become familiar with the handling of a newly powered boat. We cannot say that the district judge erred in admitting this testimony as the expert's opinion.

By the same token, had the district judge excluded the testimony, we should undoubtedly not have reversed. *Cf.* Salem v. United States Lines Co., 1962, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed. 2d 313; Krizak v. W. C. Brooks & Sons, Inc., 4 Cir., 1963, 320 F.2d 37. The language of the latter case is appropriate to this: "Whether, in any given case, the expert testimony is necessary to aid the jury in its search for the truth depends upon such a variety of factors readily apparent only to the trial judge that we must depend heavily upon his judgment." 320 F.2d at 42.

The final trial ruling which is challenged was that preventing defendant's counsel from seeing all the notes which plaintiff's surgeon-witness had brought with him. All the records used

by the doctor in his testimony on direct were made available to defendant's counsel, and he was allowed to look over the shoulder of the witness as he testified. The remaining papers were described as containing letters from other doctors, and copies of bills. There was no attempt at pre-trial discovery. There was no showing of any particular reason for the production of these papers. The district judge's refusal to allow examination of these papers lay well within her discretion.

■ The last issue is that of damages. Obviously one can characterize a cut on a thumb as not meriting an award of $21,-000. One can compare this with other verdicts and judgments for other injuries. But there is no rule of thumb that can furnish a sure guide to fairness. Given the evidence that the injury would cause the plaintiff, not merely annoyance and disability, but persistent and often acute pain for the expected fifty-five remaining years of her life, we cannot say that the damages were excessive as a matter of law.

Affirmed.

FAHY, Circuit Judge:

I concur in affirmance, but have a few words of explanation of my position regarding the use of the accident report made to the Coast Guard and, also, the allowance of the expert in motorboat operation to testify as he did to the cause of the accident. As to the former, if error there was, and I am not convinced there was none, it was harmless. The discrepancies between the witness' live testimony and his report, considered in the context of all the evidence, I think could not have affected the result reached by the judge who decided the case.

As to the expert's testimony, I am not ready to accede to the correctness of permitting him to testify as to the cause of the accident. See 2 *Jones, Evidence* § 417, at 787 (5th ed.), though Mr. Wigmore apparently sees no difficulty. 7 *Wigmore, Evidence* § 1921, at 18 (3d ed.). Had this been a jury trial I might feel obliged to reverse; but a

judge alone decided the case, and when objection to the testimony was made the judge stated, "It is his opinion, that is all." True, the fact that it was his opinion on the ultimate question poses the problem, but the statement of the judge indicates she was more perceptive about the matter than a jury might have been.

On the case as a whole, I find no firm ground for reversal, nowithstanding the doubts I have expressed.