**TRAVELERS INDEMNITY COMPANY**

v.

**GULF WEIGHING CORPORATION**
and Samuel Evanac.

**STATE FARM FIRE AND CASUALTY COMPANY**

v.

**Captain A. L. BEYER.**

**Donald R. JOHNSON**

v.

**John W. MECOM et al.**

**William H. SCHOFIELD et al.**

v.

**GULF WEIGHING CORPORA-TION et al.**

Civ. A. Nos. 70-2275, 71-1804, 72-487 and 72-488.

United States District Court,
E. D. Louisiana.

Dec. 7, 1972.

Donald L. King and W. S. McKenzie, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Travelers Indemnity Co.

Bernard K. Oppenheim, New Orleans, La., for Gulf Weighing Corp. and Samuel Evanac.

Michael E. Wanek, Porteous, Toledano, Hainkel & Johnson, New Orleans, La., for State Farm Fire and Cas. Co.

Paul A. Nalty, Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., for Donald R. Johnson.

W. S. McKenzie, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for John W. Mecom.

James A. Wood, Baton Rouge, La., for William H. Schofield and others.

W. K. Christovich, Christovich & Kearney, New Orleans, La., for Louis Battistella and Continental Ins. Co.

R. BLAKE WEST, District Judge.

## REASONS FOR JUDGMENT

Before the Court are four consolidated cases, all emanating from the sudden and unexplained sinking of the 36-foot yacht JWM II while on an ill-fated fishing trip in the Gulf of Mexico on July 5, 1970. The cases were tried before the Court without a jury.

Those on board were the organizer of the excursion, plaintiff Donald R. Johnson; plaintiff William H. Schofield, the president of the company by which Johnson was employed; Mr. Schofield's wife and daughter, also plaintiffs; Mr. Johnson's fiancee, Miss Elaine Harelson; the captain of the vessel, A. L. Beyer; and a deck-hand; the latter three not being parties to the consolidated suits. The vessel was owned by defendant, Gulf Weighing Corporation, whose president was defendant, Samuel Evanac, and was berthed at a marina in Empire, Louisiana, owned by defendant, Louis Battistella d/b/a Battistella's Empire Marina. The marina was insured by defendant Continental Insurance Company. The vessel was insured by plaintiff and defendant The Travelers Indemnity Company, which provided hull and P. & I. coverage.

In the various suits, in the order of their filing:

a) The Travelers sought a declaratory judgment against Gulf Weighing and Evanac, declaring void the hull insurance on the JWM II because of an alleged violation by the insured of the "private pleasure warranty" in the insurance contract, and Gulf Weighing in turn counter-claimed against The Travelers, asserting its right to the insurance proceeds for the loss of the JWM II, together with penalties and attorney's fees.

b) State Farm Fire & Casualty Company, as subrogee, sued Captain Beyer, Samuel Evanac, and The Travelers for reimbursement of insurance proceeds

paid to Mrs. Schofield under a floater policy for loss of a valuable ring.

c) Plaintiff Johnson sued Gulf Weighing, Evanac, and The Travelers for mental anguish, personal injuries and property losses arising out of the sinking of the JWM II.

d) The Schofield plaintiffs, like Johnson, sued Gulf Weighing, Evanac, and The Travelers, and also sued Louis Battistella d/b/a Battistella's Empire Marina and Continental.

After considering the testimony of the various witnesses and the evidence introduced at the trial, for reasons discussed more fully herein, the Court reached the following conclusions:

1. The insurance policy issued Gulf Weighing by The Travelers was not invalidated by a breach of warranty and The Travelers is liable to Gulf Weighing for the loss of the vessel JWM II;

2. The Travelers is liable in damages for mental anguish and suffering (but not for physical damages or property loss) to Johnson and the Schofields because of the negligence of Captain Beyer, who was operating the JWM II with the permission of its owner;

3. The claim of State Farm must be dismissed, because the negligence of Captain Beyer was not the cause of the loss of Mrs. Schofield's ring.

### FACTUAL BACKGROUND

At all relevant times, defendant Gulf Weighing was the owner of the vessel JWM II, which was berthed at the Battistella Marina in Empire, Louisiana. The boat had been purchased from U.S. Oil of Louisiana, Inc., a company controlled by the Mecom family interests in Houston, Texas. Mr. Battistella and his wife, as a service to the charter boat owners at the marina, kept in the marina restaurant or office a list of the charter boats in the marina, together with information furnished by the charter boat captains as to the dates on which the individual charter boats were booked and would not be available for hire. Frequently persons wishing to engage a charter boat would call the Battistella restaurant or office and, if charter boats were available, the Battistellas would advise the inquirers how they could get in touch with the captains of available charter boats. The Battistellas on inquiry might inform the callers of the general range of rate of hire for charter boats, which rate would ultimately depend upon such factors as where in the Gulf fishing would take place, but the Battistellas never acted as agents or managers of charter boat owners, never entered into any charter agreements, and never received any payment for their services from the charter boat owners or captains. There were approximately 100 vessels at the marina, of which eight, not including the JWM II, were listed with the Battistellas as charter boats.

Captain Beyer was a qualified boat captain and mechanic who worked at the Battistella Marina. He worked mainly as a mechanic and maintenance man, and, in this capacity, "serviced" approximately three-fourths of the boats at the marina, among them the JWM II.

Gulf Weighing purchased the vessel and kept it at the marina solely for the purpose of having it available for entertainment of customers and business associates. Gulf Weighing never used or considered using the JWM II as a charter boat, and never received any money from this or any other boat for charter or hire. In the words of Mr. Evanac, Gulf Weighing's president, the company "never charged anyone a single dime for the use of the boat".

As stated, the JWM II was among the many vessels at the marina "serviced" by Captain Beyer. In his words, he "took care" of the boat. He was not an employee of Gulf Weighing, received no salary from Gulf Weighing, but was paid by the job for any work done by him on the JWM II. Clearly, he had no authority to charter the vessel on behalf of Gulf Weighing.

As a part of his "servicing" of the JWM II, Captain Beyer would periodi-

cally start up and run the twin diesel engines of the boat and on occasion take it out into the Gulf. It was understood between Mr. Evanac and Captain Beyer that on such occasions Captain Beyer was authorized to fish in the Gulf and to bring along others to fish with him. In such event, Captain Beyer was to pay for the fuel, the bait, and other incidental expenses, but he was not to be paid by Gulf Weighing for his time during such excursions. As Mr. Evanac put it, Captain Beyer's running the boat during his fishing trips was "a favor for a favor". On at least one occasion prior to July 5, 1970, Captain Beyer did take such a fishing trip with his wife or other friends or relatives. On that occasion, as on July 5, 1970, Captain Beyer paid for the fuel for the boat.

Plaintiff Johnson, a resident of Baton Rouge, decided that he would like to arrange a fishing trip for the week of July 4, 1970. At some date or dates prior to July 4, he made many long distance telephone calls to various places in an attempt to find an available charter boat. According to Johnson, he called the office of John Mecom, Jr. in Houston, talked to Mr. Mecom (or someone in his office) and was advised that Mecom had an available vessel at the Battistella Marina at Empire. (It was never proven whether Mecom did, in fact, own a boat at the marina at the time, but it is apparent that, throughout the events of July 5, Mr. Johnson thought that the JWM II was a Mecom-owned vessel). On or slightly before July 4, 1970, Mr. Johnson telephoned Mrs. Battistella from Baton Rouge. According to Johnson, Mrs. Battistella told him that "the Mecom boat" was at the marina, and available. According to Mrs. Battistella, when Johnson called, she advised him that no charter boats were available, but she thought of Captain Beyer, and, thinking that Beyer might take Johnson's party out, gave Johnson Beyer's telephone number. According to Johnson, when he inquired, Mrs. Battistella stated that the charter hire would be in the neighborhood of $150.00 or $175.00.

According to Mrs. Battistella, she **had** knowledge of the arrangement between Beyer and Gulf Weighing and that Beyer never accepted payment for fishing trips.

In any event, Johnson organized a fishing party, consisting of himself, his fiancee, Mr. and Mrs. Schofield and their daughter. Early on the morning of July 5 they drove to Empire from Baton Rouge. Mrs. Battistella did not remember the Johnson party arriving on the 5th at the marina. Mr. Johnson testified that upon arrival at the marina he went to the marina office and saw Mrs. Battistella, who directed him to the JWM II. He thereafter went to the boat, met Captain Beyer. The party went aboard, their gear was loaded, and the trip commenced.

At approximately 9:30 the JWM II arrived at its destination, a drilling rig in the Gulf of Mexico, was tied to the rig, and preparations for fishing commenced. Just as Miss Schofield, the first (and only) passenger to wet a line, started fishing, it was noticed that the vessel was low in the stern. The captain raised the rear hatch and saw that the vessel was rapidly taking on water. The boat sank quickly, but the passengers and crew all managed to get free of the vessel and were duly rescued.

## LIABILITY IN THE PERSONAL INJURY SUITS

We shall first consider the rights of the parties in the two personal injury suits. Plaintiffs Johnson and the Schofields sued Gulf Weighing, Samuel Evanac, and The Travelers (as P. & I. insurer of Gulf Weighing) for damages for personal injuries, mental anguish, and property losses resulting from the sinking of the JWM II. The Schofields also sought recovery from Louis Battistella d/b/a Battistella's Marina and its insurer Continental. Johnson and the Schofields did not name Captain Beyer as a party defendant, but, as will be discussed, he was a permissive user of the JWM II, and an omnibus insured of The

Travelers, and The Travelers is thus further exposed to liability on account of the negligence of Captain Beyer.

#### a) *Gulf Weighing*

 The standard of care owed to plaintiffs by the vessel owner, Gulf Weighing, is set forth by the United States Supreme Court in Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). In *Kermarec*, a guest of a crew member of a vessel, injured in a fall on a stairway in the vessel, brought suit against the vessel owner. The Court allowed recovery, holding that the vessel owner had breached its duty of exercising reasonable care in providing a safe ship for the plaintiff guest. Speaking for a unanimous Court, Justice Stewart held that ". . . the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances." 358 U.S. at 632, 79 S.Ct. at 410, 3 L.Ed.2d at 555. The plaintiffs in this case occupied the status of visitors or guests aboard the JWM II and were therefore owed a reasonable standard of care by the vessel owner.[1] Applying this standard to the facts at issue, the Court concludes that Gulf Weighing did not breach this duty so as to cause any physical or mental injury or property loss to the plaintiffs.

Not only was there ample testimony that the JWM II was in excellent condition, but the testimony revealed that the defendants Gulf Weighing and Evanac made substantial efforts to keep the JWM II in good working order. Gulf Weighing, through Mr. Evanac, kept the vessel at Battistella's Marina in a protected area. Also, Gulf Weighing hired Captain Beyer, by reputation an expert mechanic, to look after the boat. It was Beyer's duty to go aboard the vessel, run the engines, and see generally that nothing was malfunctioning. Gulf Weighing's selection of Captain Beyer to oversee the vessel was an act of sound discretion and illustrates the careful attention paid the JWM II by Gulf Weighing. On the day before the accident, for example, Beyer testified that he had checked the vessel thoroughly; he had examined the pumps, bilges, and equipment to see that everything was in good working order. In short, Gulf Weighing and Evanac did not do anything, or fail to do anything, which would amount to a breach of reasonable care in providing for the safety of any persons aboard the JWM II.

██ The only other basis by which Gulf Weighing could be held responsible for the negligence of Captain Beyer rests on whether Gulf Weighing's conduct in turning over the JWM II to Beyer was negligent. A shipowner, in exercising reasonable care under the circumstances, has a responsibility of providing a vessel operated by competent and experienced personnel. Nuccio v. Royal Indemnity Co., 415 F.2d 228 (C.A. 5, 1969). In this case, Gulf Weighing was certainly not negligent in permitting Captain Beyer, a ship mechanic and experienced boatsman, to use the JWM II. Strom v. Anderson, 114 F.Supp. 767 W.D.N.Y.1953).

 The plaintiffs may have assumed that negligence of Captain Beyer would be imputed to Gulf Weighing under the doctrine of *respondeat superior*. This doctrine, by which an employer is vicariously liable for the acts of his employee, is based upon ". . . a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities." Ira S. Bushey & Sons, Inc. v. United

---

1. The plaintiffs cannot avail themselves of the right to a seaworthy vessel which is extended to those members of the ship's company, The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), and those doing a seaman's work and incurring a seaman's hazards, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

States, 398 F.2d 167, 171 (C.A.2, 1968). However, the facts do not bear out the existence of any type of master-servant relationship between Beyer and Gulf Weighing. On July 5, 1970, Beyer was not in the employ, nor was he acting on behalf of Gulf Weighing, but was in the pursuit of his own private interests.

In the absence of proof of negligence by Gulf Weighing, plaintiffs seek to establish liability on its part through reliance upon the doctrine of *res ipsa loquitur*. While *res ipsa loquitur* has been applied in maritime cases, both those involving negligence on the part of the vessel owner and cases of unseaworthiness, the Court is of the opinion that the doctrine is not applicable here.

■ In applying *res ipsa loquitur* to cases involving unseaworthiness, the Fifth Circuit Court of Appeals has stressed the necessity of some showing of a breach of duty owed the plaintiff, i. e., an initial showing of unseaworthiness aboard the vessel on which the plaintiff was injured. Rabb v. Canal Barge Co., 428 F.2d 201 (C.A. 5, 1970); Gibbs v. Kiesel, 382 F.2d 917 (C.A. 5, 1967); Solet v. M/V Capt. H. V. Dufrene, 303 F. Supp. 980 (E.D.La.1969). Plaintiff here relies upon cases involving application of *res ipsa loquitur* to establish negligence on the part of the vessel owner. Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. (1948); Quinn v. Southgate Nelson Corp., 121 F.2d 190 (C.A. 2, 1941), cert. den., 314 U.S. 682, 62 S.Ct. 185, 86 L.Ed. 546 (1921); Traub v. Holland-America Line, 278 F. Supp. 814 (S.D.N.Y.1967); Cozine v. Hawaiian Catamaran, Ltd., 49 Haw. 77, 412 P.2d 669 (1966); Percle v. Ordoyne, 150 So.2d 902 (La.App.1963). However, these cases also involve evidence of an "untoward effect from which a possible unseaworthy 'cause' could be argued." Rabb v. Canal Barge Co., *supra*, 428 F.2d at 203. They are thus distinguishable from the present case where the record is totally devoid of factual evidence or expert opinion as to the cause of the sinking. Four witnesses testified on

this subject—Captain Beyer, Mr. Evanac, Captain Kehoe (captain of one of the rescuing vessels, The PAT AL, who was familiar with the JWM II), and Mr. Adams (representing Allstate Insurance Company). All testified that the vessel was apparently shipshape and seaworthy. Captain Beyer, whose skills as a mechanic were unquestioned, had taken the boat out of the water in late May for repairs, had checked the bilges and hatches on July 4th and on the morning of July 5th had satisfied himself that the vessel was ready for this trip. In addition, Mr. Adams surveyed the boat on July 1st or 2nd in anticipation of the issuance of a policy of insurance covering the vessel and found it to be in satisfactory condition. The only "effect" from which negligence could be presumed is the sinking of the vessel itself, but the mere unexplained sinking of a vessel in and of itself, will not establish negligence or unseaworthiness. The Court finds especially appropriate the words of the Ninth Circuit Court of Appeals which refused to apply *res ipsa loquitur* to a sinking vessel incident:

> ". . . [*res ipsa loquitur*] has been indulged only when the claimant has been able to establish to the satisfaction of the trial court that the vessel was unseaworthy at the time it departed on its last voyage. The sea itself contains many hazards, and an inference of liability of the shipowner for the mysterious loss of his vessel will not be lightly drawn." Walston v. Lambertsen, 349 F.2d 660, 662 (C.A. 9, 1965), cert. den. 382 U.S. 980, 86 S.Ct. 553, 15 L.Ed.2d 470 (1966).

See also In Re Marine Sulphur Transport Corp., 312 F.Supp. 1081, 1098 (S. D.N.Y.1970).

■ *Res ipsa loquitur* "does not have such compulsive power that its inference of fault can override a specific negation of fault by the trier of fact." Scott v. SS Cuidad De Ibaque, 426 F.2d 1105, 1108 (C.A. 5, 1970). Therefore, there having been no showing of any unsea-

worthiness of the vessel at the time it departed the marina nor a showing of any breach by Gulf Weighing of any duty owed to any plaintiff, *res ipsa loquitur* is not applicable and plaintiffs cannot recover on this basis.

### b) *Battistella*

■ Similarly, Louis Battistella (d/b/a Battistella's Empire Marina) was in no way negligent, and did not breach any duty owed to the plaintiffs. The marina exercised no control over the vessels in the area; it merely leased boat slips to various vessel owners. The care and safety of the vessels housed at the marina was left to the individual vessel owners.

### c) *The Travelers (Beyer)*

It is undisputed that Captain Beyer, prior to the morning of July 5, had never met any of the plaintiffs and knew nothing about them. Plaintiffs arrived at the marina late for the start of a fishing trip, and Captain Beyer was anxious to get going. Although there were sufficient life jackets aboard, they were stowed away and were not observable. At no time prior to the sinking did Captain Beyer give the passengers any safety instructions, nor did he advise them of the location of the life jackets. This oversight of the captain is pointed up by the fact that prior to the sinking, according to the captain, the JWM II ran through a squall for 30 to 40 minutes (which was denied by all plaintiffs) and that one of the passengers did not know how to swim. Furthermore, it is notable that, according to the three Schofields (although it was denied by the captain), after the boat began to sink and Captain Beyer had signalled

for help, he turned his attention to an attempt to salvage his fishing gear rather than issue life jackets to the passengers, and that the captain did not furnish life jackets until requested to do so by Mrs. Schofield. Mr. Johnson also testified that he and his fiancee were not furnished a jacket until he requested jackets from the captain, and then only one jacket was furnished for the two of them. The captain "furnished" the jackets by throwing them haphazardly and hurriedly from an upper deck in the direction of the passengers on the main deck.

It was not shown that the sinking itself was caused by any negligent act or omission on the part of the captain,[2] and it was not shown that any physical damages or property losses to the individual plaintiffs resulted from his failure to give the passengers safety instructions, including instructions as to the location of the life jackets or his tardiness in furnishing the jackets. The captain's negligence in this regard, however, did play a significant role in any mental anguish suffered by plaintiffs.

■ Captain Beyer was not made a party defendant to the Johnson and Schofield actions; however, Mr. Johnson and the Schofields are entitled to recover damages for their mental anguish from The Travelers[3], which was sued as the P. & I. insurer of the vessel under Louisiana Direct Action Statute, L.R.S. 22:655, applicable to policies of marine insurance. Olympic Towing Corp. v. Nebel Towing, 419 F.2d 230 (C.A. 5, 1969).

■ Following the rule of Wilburn Boat Co. v. Fireman's Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), state policy governs interpreta-

---

2. The applicable standard of care is that of a "reasonable operator". See Engle v. Stull, 126 U.S.App.D.C. 291, 377 F.2d 930 (1967).

3. Judgment in this matter as originally issued denied recovery to the personal injury claimants on the theory that suit had not been brought against Captain Beyer. Upon timely motion for new trial by

plaintiff Johnson, the Court amended its judgment on this point upon consideration of the provisions of the Louisiana Direct Action Statute. While a motion for new trial by the Schofields was not timely, the amendment as granted affects them as their claims are identical to those of Johnson. Continental Casualty v. United States, 167 F.2d 107, 109 (C.A.9, 1948).

tion of marine insurance in the absence of ". . . a well-established federal admiralty rule". Navegacion Gova S. A. v. Mutual B. & M. Ins. Co., 1972 A.M.C. 650, 653 (S.D.N.Y., 1972). Louisiana permits suit against the insurer without the necessity of joining the insured. American Indemnity Co. v. Solomon, 231 F.2d 853 (C.A. 5, 1956); L.R.S. 22:655. This rule is in keeping with the state's settled policy that, ". . . an insurance policy against liability is not issued primarily for the protection of the insured but for the protection of the public." McDermott v. Crown Zellerbach, 418 F.2d 598, 601 (C.A. 5, 1969).

In the instant case The Travelers was sued as the insurer of Gulf Weighing [4], and not specifically as the insurer of Captain Beyer. The policy, however, contained an omnibus clause, extending coverage to permissive users of the vessel [5], which clause is liberally construed by Louisiana courts. McDermott v. Crown Zellerbach, *supra*; American Home Assurance v. Czarniecki, 216 So.2d 115 (La.App., 1968); Parks v. Hall, 189 La. 849, 181 So. 191 (1938).

In the case of Captain Beyer, it requires no liberality of construction to find that Beyer was in fact a permissive user of the JWM II. Beyer's use of the vessel on the day of the accident was in accord with the agreement of Beyer and

Evanac as to its use. The fact that Beyer was not in the employ of Gulf Weighing and Evanac at the time of the sinking is not controlling. The omnibus clause "extends protection to one 'permitted' to use . . . although the 'assured' may not be liable for the accident under the doctrine of respondeat superior." Parks v. Hall, *supra*, at 193. Coverage under an omnibus clause has also been found where the negligent party, the omnibus insured, was not a party defendant as is the case with Captain Beyer. McDowell v. National Surety Corp., 68 So.2d 189 (La.App., 1953).

Defendant has urged in post trial memoranda that there should be no recovery for the negligent acts of Captain Beyer because The Travelers was not sued as omnibus insurer of Beyer, and, therefore, made no attempt to defend him. This argument is untenable.

With reference to notice of suit provisions in insurance policies, Louisiana requires that actual prejudice result in order to preclude the insurer's liability.

"The function of the notice requirement is simply to prevent the insurer from being prejudiced, not to provide a technical escape-hatch by which to deny coverage in the absence of prejudice, nor to evade the fundamental protective purpose of the insurance

4. In Johnson v. Mecom et al, C.A. 72–487, portions of the complaint regarding The Travelers read as follows:
"IV. TRAVELERS INSURANCE COMPANY is a corporation organized under the laws of a state other than Louisiana, qualified to do and doing business within the State of Louisiana in the Parish of Orleans."
"IX. Travelers Insurance Company is, according to information and belief, the hull underwriters for the motor vessel and the liability underwriters for its owner, John W. Mecom."
A supplemental and amended complaint stated:
"4. The XYZ Insurance Company and/or The Travelers Insurance Company was the hull and liability underwriter for the JWM II, Gulf Weighing Corporation and Sam Evanac."

In Schofield v. Gulf Weighing et al, C.A. 72–488, the portion of the complaint regarding The Travelers reads as follows:
"4. At all times relative to these proceedings, Gulf Weighing Corporation was insured by Travelers Indemnity Company and Allstate Insurance Company."

5. A provision of the insurance policy reads as follows:
"DEFINITION OF INSURED:—The word 'Insured' . . . shall include, in addition to the named Insured hereunder . . . any person . . . who may be operating the yacht with the prior permission of the named Insured, except that it does not include a paid member of the crew of the insured yacht . . ."

contract to assure the insured and the general public that liability claims will be paid up to the policy limits. for which premiums were collected." Miller v. Marcantel, 221 So.2d 557, 559 (La.App., 1969).

In the instant case, there is no problem of notice of suit. The Travelers was present throughout the proceedings as a defendant in two of the consolidated suits and as plaintiff in a third. The problem is as to notice of liability for the acts of Beyer as permissive user of the JWM II, which notice the Court feels was provided by the terms of the policy itself. The insurer is presumed to have known the coverage of its policy. The insurer was represented in court and was well aware that the acts of Captain Beyer were an issue throughout the trial.[6] The fact that plaintiffs were under the mistaken impression that Beyer was the employee of Gulf Weighing should not preclude their recovery for his acts covered by the policy due to a technicality of pleading. Such a result would fly in the face of the state's policy toward liability insurance as a protection for the public, as well as Rule 15(b) of the Federal Rules of Civil Procedure, providing for amendment of pleadings to conform to the evidence. In the instant case, while there was no specific allegation that Beyer was covered under the policy as an omnibus insured, the questions of his negligence and his status in relation to Gulf Weighing Corp. were very much at issue throughout the trial as was the liability of The Travelers on the policy issued on the JWM II.

In view of these facts, the Court can find no actual prejudice to defendant insurer sufficient to merit a denial of liability under the policy provisions which clearly cover the negligence of Captain Beyer.

d) *Damages*

There having been no proof of liability on the part of any defendant (or Captain Beyer) for the sinking of the JWM II, damages must be limited to

---

6. Pre-trial orders in the Johnson and Schofield suits provide:

C.A. 72–487 *Contentions of Plaintiff:*
Plaintiff, Donald Ray Johnson, alleges that on July 5, 1970 he was lawfully aboard the JWM II as a member of a fishing party. The JWM II was, at the time of the incident complained of, owned, operated, managed and/or controlled by Gulf Weighing Corporation and Samuel Evanac and was insured by The Travelers Indemnity Company under Yacht Policy No. MYA1782949.

Plaintiff alleges that on the aforementioned date, while in the navigable waters of the Gulf of Mexico in the vicinity of Humble rig 73D, the vessel in which plaintiff was fishing sank, due to the vessel's unseaworthiness and/or the negligence of Gulf Weighing Corporation, Samuel Evanac and/or their employees and servants. As a result of this incident, plaintiff was in the waters of the Gulf of Mexico for approximately 30 minutes without the benefits of a life preserver, as a sufficient number of life preservers had not been furnished, and was caused injury, great pain, suffering, anguish and expense and whereby he was deprived the right to live his life normally, to the fullest, free from pain and anguish.

C.A. 72–488 *Contentions of Plaintiffs:*
Plaintiffs, William H. Schofield, Patricia F. Schofield, and Sherry Schofield, allege that on July 5, 1970 they were lawfully aboard the JWM II as members of a fishing party. The JWM II was, at the time of the incident complained of, owned, operated, managed and/or controlled by Gulf Weighing Corporation and Samuel Evanac and was insured by The Travelers Indemnity Company under Yacht Policy No. MYA1782949.

Plaintiffs allege that on the aforementioned date, while in the navigable waters of the Gulf of Mexico in the vicinity of Humble rig 73D, the vessel in which the plaintiffs were fishing sank due to the vessel's unseaworthiness and/or the negligence of Gulf Weighing Corporation, Samuel Evanac and/or their employees and servants. As a result of this incident, plaintiffs were in the waters of the Gulf of Mexico for approximately 30 minutes without the benefits of a life preserver, as a sufficient number of life preservers had not been furnished, and was caused injury, great pain, suffering, anguish and expense and whereby they were deprived the right to live their life normally, to the fullest, free from pain and anguish.

those caused by Captain Beyer in failing adequately to perform his duty to advise the passengers of the whereabouts of the life jackets and to distribute them instantly upon realizing that the vessel was sinking. There can be no recovery by plaintiffs for loss of personal property because there was no showing that such losses were the result of Captain Beyer's negligence; it cannot be assumed that the losses would not have occurred even if all the plaintiffs had promptly been furnished with life jackets. Likewise it appears that all physical damages alleged would have occurred with or without the proper distribution of life jackets. Thus, Mrs. Schofield (who had a life jacket) complains of an aggravation of a back condition which apparently occurred when she was being pulled aboard the rescuing vessel, and Mr. Johnson complains of having had a pain in his shoulder caused by his difficulty in getting aboard the PAT AL.

Accordingly, damages should be limited to those which will compensate plaintiffs for the mental anguish and disturbance suffered by them as a proximate result of Captain Beyer's negligence.

The Court is faced with a perplexing problem in deciding what damages are due to the plaintiffs under these circumstances, and particularly what damages are due to Mr. Johnson. At the time that the JWM II began to sink, Mr. Johnson was understandably concerned and anxious over the plight of his fiancee (now Mrs. Johnson), who could not swim. However, he did obtain a life jacket for her, and, after he had convinced her, with difficulty, to get into the water, and once she abandoned ship, there was no evidence that she experienced any difficulty. Mr. Johnson was a skillful swimmer, who, according to all the testimony, upon rescue after being in the water for fifteen minutes, was exhausted and nervous. According to Johnson, a few days after the sinking he started having nightmares every night, in which he relived the experiences of July 5th. For an unspecified period he was able to sleep only one or two hours a night, and, because of lack of sleep and nervousness, he became unable to work. Prior to the sinking he earned approximately $1200 per month (a salary of $200 per week, plus approximately $450 bonus per month) as a production foreman and salesman for a house constructing and remodeling firm owned by Mr. Schofield. According to Mr. Johnson, he was, due to his physical and mental condition, unable to work at all for six months, after which period he returned to work with Mr. Schofield for approximately one year, strictly as a salesman earning approximately $400 per month. At the time of the trial Mr. Johnson was a self-employed contractor, earning $1100 to $1200 per month, and had apparently completely recovered from his previous condition. Mr. Johnson's testimony was substantially corroborated by Mrs. Johnson and Mr. Schofield.

Dr. Steele, a psychiatrist, examined and treated Johnson on two occasions, July 23 and July 27, 1970. His diagnosis was post-traumatic psychoneurotic disorder and anxiety reaction. He related this condition to the events of July 5th. This condition, according to the doctor, could well have a direct bearing on Mr. Johnson's ability to work and carry on normal functions. However, the doctor's prognosis was optimistic, and he would not have predicted that impairment of ability to work would have lasted as long as six months. He was surprised that Johnson did not return for further treatment after July 27, 1970.

It is obvious that all of Johnson's mental suffering was not the result of Captain Beyer's negligence. Johnson's main concern was over his fiancee. However, she had a jacket, and it was apparent to the Court that Johnson's main stress occurred during the period in which he was unable to persuade his fiancee to abandon the vessel. It was apparent that he was terrified that they would literally go down with the ship. This particular mental stress and agony did not result from Captain Beyer's neg-

ligence. It occurred because of the fact of the sinking of the ship, for which Captain Beyer was not responsible. Thus, the perplexing question for the Court is what portion of Mr. Johnson's suffering and mental and emotional difficulties, and the results thereof, was the proximate result of the negligence of Captain Beyer. Taking all factors into consideration, it is the opinion of the Court that Mr. Johnson will be fairly compensated for his mental suffering and its results proximately caused by Captain Beyer's negligence by a judgment of $5,000 against The Travelers.

As to the Schofields, each spent ten to fifteen minutes in the water and each suffered some degree of mental anguish as a result of Captain Beyer's failure to furnish Mr. Schofield, who was not a good swimmer, with a suitable life jacket. The Court finds that Mr. and Mrs. Schofield are each entitled to a judgment in the amount of $500, and that the Schofields are entitled to a judgment in the amount of $500 on behalf of their minor daughter.

## LIABILITY UNDER THE HULL POLICY

### a) Inchmaree Clause

On July 5, 1970 there was in force a hull policy issued by The Travelers, insuring the JWM II, which included a typical Inchmaree Clause [7]:

> "PERILS INSURED: The insurance provided by this section covers against:
>
> . . . . . .
>
> (b) Physical loss or damage to the property covered directly caused by the following:
>
> (1) . . . any latent defect in the machinery or hull . . ."

Under this clause the owner's obligation under the policy is "ex-

tremely limited". That is, the owner of a vessel or those in privity with him are under an obligation not knowingly to send a vessel to sea in a deficient condition. *Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa.*, 247 F.2d 116 (C.A. 5, 1957); *Saskatchewan Government Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385 (C.A. 5, 1957).

In the present case, according to all of the testimony, the JWM II was in excellent condition when it departed from Battistella's Marina. Captain Beyer had given the vessel a thorough inspection before taking her out to sea. Only in the Gulf did the vessel's unseaworthy condition (the leak) manifest itself. It was to this type of situation that the policy was meant to apply. As explained by Chief Judge Brown of the Fifth Circuit Court of Appeals:

> "The Inchmaree clause insures against damage or loss occasioned by latent *defects* in machinery or hull. Of course, a defect in machinery or a defect in a hull means that the vessel is thereby unseaworthy since, with such defect, the machinery or hull, cannot comply with the classic definition of 'reasonably suitable' for the purposes intended." *Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa., supra*, 247 F.2d at 120.

The vessel's hull did not leak while housed at Battistella's Marina nor apparently on its way out into the Gulf. The conclusion is compelling that any defect was latent, that the defect could not have been discovered by the vessel owner or one in privity with him by any known and customary test, that the Inchmaree clause is applicable, and that, therefore, Gulf Weighing is entitled to recover $33,000.00 under its insurance contract with The Travelers. *Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa., supra*; *Waterman*

---

7. An "Inchmaree" clause is one usually inserted in hull policies by which the underwriter agrees to cover loss or damage to the hull or machinery of the vessel through any latent defect. DeKerhove, International Maritime Dictionary, 2d Ed. p. 391.

S.S. Corp. v. U. S. Smelting, Refining & Mining Co., 155 F.2d 687 (C.A. 5, 1946).

### b) Private pleasure warranty

■ As stated, The Travelers took the position that, irrespective of the provisions of the Inchmaree clause, at the time of the sinking of the JWM II, it was under charter and that the hull coverage was therefore not effective. The policy included the following private pleasure warranty:

"PRIVATE PLEASURE WARRANTY:—Warranted to be used solely for private pleasure purposes and not to be hired or chartered unless approved and permission endorsed hereon."

The Travelers contends that arrangements for the fishing excursion constituted a charter agreement in contravention of the warranty and that under state and federal law such breach rendered the insurance contract void. However, this Court has concluded that there was no charter or hiring agreement involving the JWM II at the time of its sinking; the insurance agreement was not breached.

■ The Court of Appeals for the Fifth Circuit has stated that, "The essence of a charter agreement is that the charterer *employs* the entire ship or a substantial portion of it for a particular voyage or a particular period of time from one holding himself out as a public carrier." Jefferson Chemical Co. v. M/T Grena, 413 F.2d 864, 867 (C.A. 5, 1969). (Emphasis added). The employment agreement is simply a contract, subject to the general rules and specifications of contract law. Gilmore & Black, The Law of Admiralty, § 4–1. In the present case, there was no contractual agreement between any parties regarding the hiring or the employing of the JWM II on July 5, 1970.

None of the testimony of Johnson, Beyer, or Mrs. Battistella lends any substantial support to the theory that there was a charter agreement. As stated, Beyer was simply a mechanic and maintenance man who serviced various vessels docked at the Battistella Marina, among them the JWM II. As a favor from Mr. Evanac, Beyer was permitted to take the JWM II on fishing outings at his own expense. In this capacity, Beyer was simply a permissive user of the vessel. Beyer's only use of the boat prior to the fateful July 5th excursion was a pleasure cruise with members of his family. Neither he nor Mrs. Battistella had any authority to let the JWM II out for hire.

■ According to Beyer, his only action in connection with the fishing expedition was to agree to take the plaintiffs out in accordance with his understanding that Mr. Evanac, his purpose being to have plaintiffs share the expenses of the trip.[8] Furthermore, Johnson, the initiating party in the fishing outing, testified that he reached no charter agreement with Captain Beyer. He stated that he did speak to Beyer about possible payment for the trip, but was always told, "You do not have to pay me", or "You do not have to pay me, now." There was absolutely no testimony that any payment of any particular amount of money was ever agreed upon at any time between Johnson and Beyer, assuming, arguendo, that Beyer had any right to charter the vessel, which was not the case. As stated, Captain Beyer apparently expected some payment from Johnson by way of sharing of expenses; and according to Johnson, it was his understanding at some point that Beyer expected no compensation for the fishing trip. "I had a feeling that they were going to take us on a fishing trip and say we enjoyed having you and when we got back and maybe

8. The mere sharing of expenses by members of a fishing party does not constitute a charter agreement. Cf., *Jefferson Chemical Co.*, *supra.*

tipped the Captain and the boat $50.00 and that was it, I had that impression." [9]

 The requirement of mutuality of assent as a prerequisite for a valid contract is applicable to charter agreements. Compania Bilbaina v. Spanish-American Light & Power Co., 146 U.S. 483, 13 S.Ct. 142, 36 L.Ed. 1054 (1892); Orient Mid-East Great Lakes Service v. International Export Lines, Ltd., 315 F.2d 519 (C.A. 4, 1963). In the present case, there was simply no satisfactory proof by The Travelers of a lease or charter agreement between Gulf Weighing and Johnson, and The Travelers is liable to Gulf Weighing under its hull policy.

The Court knows of no basis in maritime law for an award to Gulf Weighing and Samuel Evanac for penalties and attorney's fees due to the failure of The Travelers to pay. Assuming the applicability of the state law, Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), this claim must fail, the denial of The Travelers to pay having not been arbitrary, capricious or without probable cause, but rather having been based upon a good faith belief that the insured had breached a warranty in its policy. See La.R.S. 22:658.

### CLAIM OF STATE FARM

Finally, the Court must decide the claim of State Farm, which is seeking reimbursement for money paid Mrs. Schofield for the loss of a ring in the boating accident. This claim is denied because there was no showing of any negligence on the part of any defendant which caused the ring to be lost. As stated, the *only* possible negligent conduct in any way involved in the sinking of the JWM II was that of Captain Beyer. However, despite the Court's holding that his failure promptly to furnish Mrs. Schofield with a life jacket was negligent, there was no proof that such negligence was the cause of her loss of her ring.

This opinion will serve in lieu of findings of fact and conclusions of law. An appropriate order has been issued heretofore.

---

9. Deposition of Donald Ray Johnson at 66. This would seem to be consistent with Johnson's apparent belief that the JWM II was a Mecom vessel.